# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ARAG-A Limited, ARAG-O Limited, ARAG-T Limited, ARAG-V Limited, Honero Fund I, LLC, Attestor Vale Master Fund, Bybrook Capital Hazelton Master Fund LP, Bybrook Capital Master Fund LP, MCHA Holdings, LLC, Red Pines LLC, Spinnaker Global Emerging Markets Fund, Ltd., Spinnaker Global Special Situations Fund LP, Trinity Investments Limited, White Hawthorne, LLC, White Hawthorne II, LLC and Yellow Crane Holdings, L.L.C., | 16 Civ. 2238 (TPG) |
| Plaintiffs, | |
| v. | |
| The Republic of Argentina, | |
| Defendant. | |

## MEMORANDUM OF LAW IN SUPPORT OF ORDER TO SHOW CAUSE FOR A TEMPORARY RESTRAINING ORDER AND A PRELIMINARY INJUNCTION

Timothy B. DeSieno
Kenneth I. Schacter
Stephen Scotch-Marmo
MORGAN, LEWIS & BOCKIUS LLP
101 Park Avenue
New York, NY 10178
(212) 309-6000

Sabin Willett
Christopher L. Carter
MORGAN, LEWIS & BOCKIUS LLP
One Federal Street
Boston, MA 02110
(617) 951-8000

*Counsel for Moving Plaintiffs*

Brian S. Rosen
Richard L. Levine
Richard W. Slack
David Yolkut
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
(212) 310-8000

*Counsel for Moving Plaintiffs*

## Table of Contents

**Page**

**TABLE OF AUTHORITIES** ................................................................................ ii

**PRELIMINARY STATEMENT** ............................................................................1

**STATEMENT OF FACTS** ....................................................................................3

    A.   Movants' New York-Law And Foreign-Law Bond Holdings ................................4

    B.   The 2016 Unilateral Settlement Proposal And The Indicative Ruling ..................5

    C.   Movants All Accept The 2016 Unilateral Settlement Offer ................................6

    D.   Argentina's Submission To This Court Of Various Settlement Agreements .........7

    E.   Argentina Reneges On Its Unilateral Settlement Offer ................................8

**ARGUMENT** ......................................................................................................10

I.    LEGAL STANDARD ......................................................................................10

II.   MOVANTS SATISFY THE REQUIREMENTS FOR A TEMPORARY
RESTRAINING ORDER AND A PRELIMINARY INJUNCTION ..............................10

    A.   Movants Will Succeed On The Merits ................................................10

    B.   Movants Will Suffer Irreparable Harm Absent Injunctive Relief ........................21

    C.   The Balance Of Hardships Tilts Decidedly Toward Movants ............................23

    D.   The Public Interest Favors Granting Injunctive Relief ........................................23

  **CONCLUSION** ................................................................................................24

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Benihana, Inc. v. Benihana of Tokyo, LLC,*
    784 F.3d 887 (2d Cir. 2015).................................................................................10

*BigStar Entm't, Inc. v. Next Big Star, Inc.,*
    105 F. Supp. 2d 185 (S.D.N.Y. 2000)....................................................................10

*Consarc Corp. v. Marine Midland Bank, N.A.,*
    996 F.2d 568 (2d Cir. 1993)..................................................................................11

*Corvello v. Wells Fargo Bank, NA,*
    728 F.3d 878 (9th Cir. 2013), *as amended on reh'g in part* (Sept. 23, 2013) .................. 13-14

*Echo Design Grp. v. Zino Davidoff S.A.,*
    283 F. Supp.2d 963 (S.D.N.Y. 2003).....................................................................10

*Firemen's Ins. Co. of Newark, New Jersey v. Keating,*
    753 F. Supp. 1146 (S.D.N.Y. 1990)......................................................................21

*Flex-Foot, Inc. v. CRP, Inc.,*
    238 F.3d 1362 (Fed. Cir. 2001).............................................................................24

*Fullerton v. Prudential Life Ins. Co. of Am.,*
    No. 99 Civ. 4453, 2000 WL 1810099 (S.D.N.Y. Nov. 30, 2000) ..........................11

*Intellivision v. Microsoft Corp.,*
    484 F. App'x 616 (2d Cir. 2012) ..........................................................................20

*Itek Corp. v. First National Bank,*
    730 F.2d 19 (1st Cir. 1984)............................................................................. 21-22

*Janus Films, Inc. v. Miller,*
    801 F.2d 578 (2d Cir. 1986)..................................................................................24

*Jarecki v. Shung Moo Louie,*
    95 N.Y.2d 665 (2001) ...........................................................................................14

*Kowalchuk v. Stroup,*
    61 A.D.3d 118 (1st Dep't 2009) ...........................................................................15

*Krumme v. WestPoint Stevens Inc.,*
    143 F.3d 71 (2d Cir. 1998)....................................................................................11

*M/S Bremen v. Zapata Off-Shore Co.*,
　　407 U.S. 1 (1972)....................................................................................................24

*McCarthy v. Am. Int'l Grp.*,
　　283 F.3d 121 (2d Cir. 2002)....................................................................................19

*Morgan Stanley Grp. v. New England Ins. Co.*,
　　225 F.3d 270 (2d Cir. 2000)....................................................................................19

*New Hampshire v. Maine*,
　　532 U.S. 742 (2001)................................................................................................19

*NML Capital Ltd. v. Republic of Argentina*,
　　No. 08-cv-6978-TPG, 2016 WL 836773 (S.D.N.Y. Mar. 2, 2016)................................. *passim*

*NML Capital, Ltd. v. Republic of Argentina*,
　　699 F.3d 246 (2d Cir. 2012).................................................................................4, 22

*NML Capital, Ltd. v. Republic of Argentina*,
　　727 F.3d 230 (2d Cir. 2013)..............................................................................4, 22, 24

*NML Capital, Ltd. v. Republic of Argentina*,
　　No. 08-cv-6978 TPG, 2016 WL 715732 (S.D.N.Y. Feb. 19, 2016)............................... *passim*

*NML Capital, Ltd. v. Republic of Argentina*,
　　No. 14 Civ. 8601(TPG), 2015 WL 3542535 (S.D.N.Y. June 5, 2015).....................................4

*NML Capital, Ltd. v. Republic of Argentina*,
　　No. 14 Civ. 8601(TPG), 2015 WL 6656573 (S.D.N.Y. Oct. 30, 2015) ...........................4, 21

*Saks Inc. v. Attachmate Corp.*,
　　No. 14 CIV. 4902, 2015 WL 1841136 (S.D.N.Y. Apr. 17, 2015)..........................................19

*Shapiro v. Cadman Towers, Inc.*,
　　51 F.3d 328 (2d Cir. 1995).........................................................................................21

*Tractebel Energy Mktg., Inc. v. AEP Power Mktg., Inc.*,
　　487 F.3d 89 (2d Cir. 2007)..........................................................................................13

*Trinity Invest. Ltd. v. Republic of Argentina*,
　　No. 15 Civ. 2611(TPG), 2015 WL 6447731 (S.D.N.Y. Oct. 22, 2015) ....................................4

*USA Network v. Jones Intercable, Inc.*,
　　729 F. Supp. 304 (S.D.N.Y. 1990).............................................................................11

*Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*,
　　396 F.3d 96 (2d Cir. 2005)..........................................................................................24

*Weltover, Inc. v. Republic of Argentina*,
    941 F.2d 146 (2d Cir. 1991)..............................................................................24

*Wigod v. Wells Fargo Bank, N.A.*,
    673 F.3d 547 (7th Cir. 2012) ...........................................................................13

*Williams-Yullee v. Florida Bar*,
    135 S.Ct. 1656 (2015).....................................................................................24

*Zheng v. City of New York*,
    19 N.Y.3d 556 (2012) ......................................................................................11

## Other Authorities

Fed. R. Civ. P. 65 ....................................................................................................1

Glen Banks, N.Y. Prac., Contract Law § 26:23 ....................................................11

Virod Sreeharsa, *Argentina's Senate Allows Payment to Bondholders*, N.Y. Times (Mar. 31,
    2016) ...................................................................................................................8

Moving Plaintiffs ("Movants") respectfully submit this Memorandum of Law in support of the entry of an Order to Show Cause requiring defendant Republic of Argentina ("Argentina") to show why, pursuant to F.R.C.P. 65(a) and 65(e), a temporary restraining order and a preliminary injunction should not be entered barring Argentina from notifying this Court that it has met the second condition precedent set out in *NML Capital Ltd. v. Republic of Argentina*, No. 08-cv-6978-TPG, 2016 WL 836773 (S.D.N.Y. Mar. 2, 2016) (the "March 2 Order") without first making full payment to Movants, holders of defaulted Argentine bonds who entered into settlement agreements in principle with Argentina on or before February 29, 2016 (the "Settlement Agreements").[1]

## PRELIMINARY STATEMENT

After making a unilateral offer open to all holders of long defaulted Argentine bonds to settle their claims on February 17, 2016 (the "Unilateral Settlement Offer") – an offer each Movant accepted pursuant to its terms on or before Argentina's then deadline of February 29, 2016 – Argentina has declared its intention to renege on its contractual commitment to settle on the terms it offered. Such a breach would be Argentina's latest about-face, and it occurred only after Argentina had convinced this Court that the many *pari passu* injunctions (the "Injunctions") should all be lifted because Argentina had "changed its ways," as shown by the "numerous settlements" with bondholders that its efforts had "yielded." To obtain that relief, Argentina submitted to this Court a settlement with Red Pines LLC ("Red Pines"), as well as settlements with two other holders of largely the same bonds (VR Global Partners ("VR") and Procella

---

[1] Movants are the following plaintiff entities: ARAG-A Limited ("ARAG-A"), ARAG-O Limited ("ARAG-O"), ARAG-T Limited ("ARAG-T"), ARAG-V Limited ("ARAG-V"), Attestor Value Master Fund LP ("Attestor"), Bybrook Capital Master Fund LP ("Bybrook Capital"), Bybrook Capital Hazelton Master Fund LP ("Bybrook Capital Hazelton") (Bybrook Capital and Bybrook Capital Hazelton together, "Bybrook"), Honero Fund I, LLC ("Honero"), MCHA Holdings, LLC ("MCHA"), Trinity Investments Limited ("Trinity"),White Hawthorne, LLC ("White Hawthorne"), White Hawthorne II, LLC ("White Hawthorne II"), and Yellow Crane Holdings, LLC ("Yellow Crane").

Holdings ("Procella")).  After this Court indicated it would lift the Injunctions, however, Argentina reneged on the Settlement Agreement with Red Pines and numerous others (including all of the Movants), indicating that it will *not* pay any of them under their Settlement Agreements.  Thus, on March 25, 2016, Movants brought this action seeking declaratory judgments that their Settlement Agreements are binding and injunctive relief.  *See* Dkt. 1 (Declaratory Judgment Complaint).

Emergent relief now is necessary because Movants face the very real risk that, if the Injunctions are vacated, Argentina will not pay them what it owes either (i) under their confirmed Settlement Agreements (if Movants' present action is resolved in their favor), or (ii) the ultimate money judgments that Movants will obtain in related litigation for Argentina's years of missed principal and interest payments.  Indeed, Argentina's history of intransigence shows that it is only this Court's Injunctions that make settlement with Argentina even a possibility.

To protect themselves from Argentina's latest round of inequitable conduct, Movants seek limited and temporary injunctive relief pending a disposition on the merits, which Movants are prepared to litigate on an expedited basis.  Specifically, Movants seek to preserve the *status quo* and prevent Argentina from falsely claiming that it has paid "all" plaintiffs with whom it has reached agreements in principle, while ignoring Movants' Settlement Agreements.

Movants easily satisfy the requirements for injunctive relief.  First, Movants are likely to succeed on the merits – or, at a minimum, can show serious questions going to the merits – that each of the Settlement Agreements is a binding contract constituting an "agreement in principle" that must be paid by Argentina as a precondition to the vacatur of the Injunctions.  As set forth below, both the plain terms of the settlement documents and Argentina's own statements and conduct confirm its understanding that the parties entered binding Settlement Agreements

through Movants' completion and execution of the Agreement Schedules.  Further, the doctrine

of judicial estoppel precludes Argentina from taking the position that the Settlement Agreements

are not binding based on its submissions of settlements to this Court covering the exact same

bonds in order to obtain the March 2 Order.  *See* Argument, § II.A.

Second, without injunctive relief, Movants will suffer irreparable harm.  While the

number of creditors impacted by Argentina's inequitable conduct may have decreased from the

time of its prior coercive exchange offers, Argentina's conduct remains no less pernicious.  Once

the Injunctions are lifted, Movants will have no effective remedy at law for Argentina's refusal

to meet its contractual obligations. Movants will be in the *exact position* they were in at the time

this Court issued the *pari passu* Injunctions.  *See* Argument, § II.B.

Third, the balance of hardships tilts decisively in Movants' favor.  A limited and

temporary injunction – pending only the quick resolution of the merits of this action – will affect

no unfair hardship on Argentina.  Indeed, Argentina has a ready "out" from under any injunctive

remedy: it need only honor its contractual obligations under the Settlement Agreements and

"make full payment" to each Movant "in accordance with the specific terms of each such

agreement" as stated in the March 2 Order.  *See* Argument, § II.C.

Fourth, the narrow injunction sought by Movants will serve the public interest in the (i)

enforcement of contracts; (ii) integrity of the judicial process given the (uncorrected)

misstatements Argentina has made to the Court; and (iii) promotion of settlement of complex

lawsuits, particularly with a foreign sovereign.  *See* Argument, § II.D.

## STATEMENT OF FACTS

The facts relevant to this Motion are summarized below and set out in the numerous

supporting declarations.

### A.      Movants' New York-Law And Foreign-Law Bond Holdings

Each Movant holds defaulted Argentine bonds, some governed by New York law under a Fiscal Agency Agreement dated October 19, 1994 (the "FAA") (the "New York-law Bonds"), others governed by German law under an offering circular dated July 14, 1998 (the "Offering Circular"), and still others governed by English law under a Trust Deed dated July 23, 1993 (the "Trust Deed") (such bonds together, the "Foreign-law Bonds").[2]

Each Movant has litigation pending against Argentina concerning Argentina's failure to pay principal and interest on their respective bonds following Argentina's default on all of its public debts in December 2001.[3]  In 2015, some Movants (as well as other plaintiff bondholders) sought and obtained partial summary judgment and *pari passu* Injunctions to redress Argentina's repeated breaches of the Equal Treatment Provisions.[4]  As this Court held only six months ago in entering the so-called "Me-Too Injunctions," Argentina's continued "violations of the *pari passu* clause" resulted in irreparable harm to plaintiffs.  *See* 2015 WL 6656573, at *4.  Other Movants have also pursued the entry of an injunction, but their motions remain pending before this Court.

---

[2] Argentina expressly pledged that it would protect holders of New York-law Bonds from subordination and guaranteed them equal treatment amongst themselves.  Declaration of Stephen Scotch-Marmo ("Scotch-Marmo Decl.") Ex. 1 at § 1(c).  It similarly pledged that it would protect holders of the Foreign-law Bonds on a "*pari passu*" basis.  *See id.* Ex. 2 at § 9; *id.* Ex. 3 at § 3 (collectively, the "Equal Treatment Provisions").

[3] As reflected in numerous rulings by this Court and the Second Circuit, Argentina also enacted or renewed an annual moratorium prohibiting payments on the defaulted bonds, and then passed a "Lock Law" which collectively prevented Argentina's courts from enforcing any money judgments held by holders of defaulted Argentine bonds. In each of 2005 and 2010, Argentina presented bondholders with take-it-or-leave-it offers to exchange their defaulted bonds for new bonds on terms favorable to Argentina (the "Exchange Offers"), and its legislation precluded settlement with any bondholders that did not participate in the Exchange Offers.  Argentina began issuing bonds under the Exchange Offers, carved them out from its payment moratoria, and began to make billions of dollars of payments on these new bonds without making any ratable payments on the New York-law Bonds and the Foreign-law Bonds.  *See generally NML Capital, Ltd. v. Republic of Argentina*, 699 F.3d 246 (2d Cir. 2012) ("*NML I*"); *NML Capital, Ltd. v. Republic of Argentina*, 727 F.3d 230 (2d Cir. 2013) ("*NML II*").

[4] *See NML Capital, Ltd. v. Republic of Argentina*, No. 14 Civ. 8601(TPG), 2015 WL 3542535 (S.D.N.Y. June 5, 2015); *Trinity Invest. Ltd. v. Republic of* Argentina, No. 15 Civ. 2611(TPG), 2015 WL 6447731 (S.D.N.Y. Oct. 22, 2015); *NML Capital, Ltd. v. Republic of Argentina*, No. 14 Civ. 8601(TPG), 2015 WL 6656573, at *4 (S.D.N.Y. Oct. 30, 2015) (the "October 30 Order").

**B.      The 2016 Unilateral Settlement Proposal And The Indicative Ruling**

In December 2015, Mauricio Macri became President of Argentina.  In the following months, government officials met with *some* of the holders of Argentina's defaulted bonds and reached agreements with a small number of them. Argentina, though, refused to engage with the vast majority of holders of defaulted bonds (including Movants).[5]  Instead, on February 5, 2016, it publicly issued a unilateral settlement proposal (the "Unilateral Proposal"), which provided no mechanism for acceptance by bondholders.  Scotch-Marmo Decl. ¶¶ 6-7 & Exs. 4-5.

Argentina then moved by Order to Show  Cause for an "indicative ruling" that this  Court would vacate the Injunctions if Argentina first (i) repealed the Lock Law and other similar legislation; and (ii) paid all bondholders that had reached a settlement agreement in principle with Argentina "on or before February 29, 2016."  Citing "changed circumstances," this Court issued the Indicative Ruling on February 19, 2016, indicating it would lift the Injunctions upon the occurrence of the two proposed conditions.[6]  The Court noted that it "does not have the power to force plaintiffs to accept a settlement," but emphasized that the plaintiffs would now have "the opportunity to negotiate and settle their claims."  *Id.* at **9-10.  Most importantly for the instant motion, the Indicative Ruling further provided that any bondholder that reached an agreement in principle with Argentina by February 29, 2016, would "receive the protections incorporated by" the ruling.  *Id.* at *10.  Those who did not, however, risked being left without the protections of Injunctions, with no assurance (consistent with Argentina's past conduct) that Argentina would ever settle, honor settlement agreements, or pay any subsequent judgments.

---

[5] *See, e.g.*, Steven Krause Decl. ¶ 4 (re MCHA); Murat Korkmaz Decl. ¶ 7 (re ARAG-A Limited, ARAG-O Limited, ARAG-T Limited and ARAG-V Limited); Siong Wei "Max" Lee Decl. ¶ 5 (re Honero); Daniel Ehrmann Decl. ¶ 4 (re Yellow Crane); Pierre Bour Decl. ¶ 6 (re Attestor and Trinity).

[6] *See NML Capital, Ltd. v. Republic of Argentina*, No. 08-cv-6978 TPG, 2016 WL 715732, *6 (S.D.N.Y. Feb. 19, 2016) (the "Indicative Ruling").

### C.   Movants All Accept The 2016 Unilateral Settlement Offer

On February 17, 2016, and while Argentina's Order to Show Cause still was pending, Argentina published on its website, in English, a formal settlement offer to all holders of defaulted bonds.  The offer, drafted entirely by Argentina, was comprised of a set of "Instructions for Bondholders to Accept its Settlement Proposal" (the "Instructions"), a "Master Settlement Agreement" (the "MSA"), and an "Agreement Schedule" by which a bondholder could accept the offer (together, the "Unilateral Settlement Offer").  Scotch-Marmo Decl. Exs. 6-7.  The Instructions stated that "Holders may become a party to a Settlement Agreement by executing and exchanging with [Argentina] a completed Agreement Schedule, the form of which is attached as Exhibit A to the [MSA.]"  *Id.* Ex. 6.  The Agreement Schedule could be accepted by *any* holder of defaulted Argentina bonds, and it contained a pre-signed acceptance, as reflected by Argentina's signature line ("/s/")).  *Id.* Ex. 7 at pp. 8.

The Unilateral Settlement Offer did not exclude any bonds on the basis of any statute of limitations argument by Argentina.  Contrary to Argentina's later contention, the *only* excluded bonds were those "as to which the *contractual prescription period* set out in the relevant instrument evidencing those bonds has expired."  *Id.* Ex. 7 (MSA at § 1) (defining "Prescribed Claims").[7]  As shown below, the relevant instruments governing Movants' bonds—*i.e.*, the FAA, the Offering Circular, and the Trust Deed—each contain express "contractual prescription" provisions.

With Argentina's arbitrary February 29, 2016, deadline looming, each Movant accepted Argentina's Unilateral Settlement Offer by completing and executing an Agreement Schedule

---

[7] The Unilateral Proposal also referred to a contractual prescription limitation, not a statute of limitations, where it stated that payment on bonds "that have been *prescribed* according to the contractual terms and the applicable laws will not be acknowledged."  *See id.* Ex. 4 (emphasis added).  The Unilateral Proposal was superseded by, and integrated within, the MSA, which as noted, refers only to contractual prescription.

and submitting it to Argentina; Argentina almost invariably acknowledged receipt.[8]

D.     **Argentina's Submission To This Court Of Various Settlement Agreements**

On February 29, 2016, Argentina filed supplemental papers in support of its February 25, 2016, letter-motion to enter the Indicative Ruling as an Order.  Its filing recognized that "any plaintiff who has reached an agreement to settle with [Argentina] by [February 29, 2016] *must be paid* as a precondition to vacating the Injunctions."  *See* Dkt. 904-2, 1:08-cv-06978-TPG (Feb. 29, 2016).  Argentina represented that its discussions with bondholders "have already yielded numerous settlements, totaling in excess of $6.2 billion with plaintiffs in these actions alone, plus additional amounts with other holders of defaulted debt."  *Id.* at 3.  To underscore the point to this Court, Argentina filed the second supplemental declaration of Santiago Bausili, Argentina's Undersecretary of Finance (the "Bausili Decl.").  *See* Scotch-Marmo Decl. Ex. 8.  The Bausili Decl. represented that Argentina "has entered into agreements in principle to settle claims made by numerous bondholders" and attached as exhibits several such agreements in principle.  *Id.* at ¶¶ 6, 11-13.  Among them were agreements with Red Pines (which had not been countersigned), as well as with bondholders VR and Procella.  These agreements in principle included New York-law, German-law, and English-law bonds covered by the various offer acceptances submitted by the various Movants, including interest and principal on bonds that Argentina would later claim to be "time-barred" (*e.g.*, bonds with maturity dates from 2002 and 2003 and interest from early periods).[9]

---

[8] *See* Krause Decl. ¶ 12 (re MCHA); Korkmaz Decl.¶ 15 (re ARAG-A Limited, ARAG-O Limited, ARAG-T Limited and ARAG-V Limited submission); Lee Decl. ¶ 22 (re Honero); Bour Decl. ¶¶ 24, 26 (re Attestor and Trinity).  Argentina never communicated to Yellow Crane any rejection of their acceptances or advised that its acceptance should be subject to the statute of limitations.  Ehrmann Decl. ¶ 16 (re Yellow Crane).

[9] *See* Scotch-Marmo Decl. Ex. 8 (Bausili Decl. Ex. 7 (settlement with VR) (the "VR Settlement"); Ex. 8 (settlement with Procella) (the "Procella Settlement"); Ex. 9 (settlement with Red Pines) (the "Red Pines Settlement").  Certain Movants filed a letter with this Court that same day (the "February 29 Letter"), stating that they, too, had reached agreements in principle to settle with Argentina in reliance on the Indicative Ruling and "Argentina's

At oral argument on March 1, 2016, counsel for Movants stated that their clients had accepted Argentina's Unilateral Settlement Offer and entered into binding Agreements in Principle in reliance on the requirement in the Indicative Ruling that they would be entitled to payment in full pursuant thereto as a condition to lifting the Injunctions.  Scotch-Marmo Decl. Ex. 10 (3/1/16 H'rg Tr. at 42:6-43:5) (Willett); *id.* at 35:12-16 (Levine).  Argentina did not dispute these statements.  *Id.* at 13:6-17:22 and 49:13-50:25 (Paskin).

On March 2, 2016, this Court issued an order largely adopting its Indicative Ruling, which provided that the Injunctions would be lifted upon Argentina's satisfaction of two conditions precedent:  (1) the repeal of "all legislative obstacles to settlement"; and (2) the "full payment in accordance with the specific terms" of each "agreement in principle" entered into by any plaintiff "on or before February 29, 2016."  March 2 Order, 2016 WL 836773, at *2.  Argentina "must also notify the court once those plaintiffs have all received full payment."  *Id.*[10]

### E.      Argentina Reneges On Its Unilateral Settlement Offer

In a sharp departure from its sworn representations to this Court, and apparently emboldened by its initial litigation success, Argentina has indicated that it will seek to renege on its Settlement Agreements with Movants.  After hinting of such intent over several prior days, on March 11, 2016, Argentina formally advised that it would not voluntarily honor its Settlement Agreements with certain Movants.  *See* Scotch-Marmo Decl. Ex. 11 (email from S. Willett to M. Paskin dated Mar. 11, 2016).  In its brief to the Second Circuit ten days later, Argentina left no

---

representations made to the District Court – and its requirement that the [Movants] are entitled to payment in full in accordance with their settlements as a condition to the lifting of the injunctions." Scotch-Marmo Decl. ¶ 11 & Ex. 9. *Argentina did not dispute the statements*.

[10] Argentina appears to have fulfilled the first condition precedent when its Senate voted to approve measures to repeal the "Lock Law" and the sovereign payment law.  *See* Virod Sreeharsa, *Argentina's Senate Allows Payment to Bondholders*, N.Y. Times (Mar. 31, 2016), *available at* http://www.nytimes.com/2016/04/01/business/dealbook/argentinas-senate-allows-payment-to-bondholders.html?_r=0.

doubt that it would not honor *any* of Movants' Settlement Agreements.  *See id.* Ex. 12

(Argentina Appellee Br., dated Mar. 21, 2016, at 38 and 48 n.17).  Argentina also told the

Second Circuit – but never this Court – that its submissions to this Court of the VR, Procella and

Red Pines settlements (annexed to the Bausili Decl.) were "mistaken[]" because they provided

for payment on claims that Argentina subsequently considered to be "time-barred."  *See id.* at 13

n.3.

There was no such "mistake," however.  Argentina had lists of the relevant bonds *for*

*more than ten days* before it submitted the agreements to this Court as "true and correct . . .

Agreements in Principle."  *See* Ehrmann Decl. ¶¶ 9-11 & Exs. 1-3; Bour Decl. ¶¶ 15-16 & Exs.

1-2.  Argentina told Mr. Bour of Attestor and Trinity on February 12, 2016, that the *only*

limitation to its settlement offer was "contractual prescription."  Bour Decl. ¶¶ 10-13.  It said the

same thing to Mr. Ehrmann of Yellow Crane four days later.  Ehrmann Decl. ¶ 7.  It told Honero

essentially the same thing on the morning of February 19, 2016, just hours before this Court

issued its Indicative Ruling. Lee Decl. ¶ 16 & Ex. 9.  Moreover, two attachments to the Bausili

Decl. – the VR Settlement and the Procella Settlement – included riders expressly stating that

"no Prescribed Claims exist with respect to the Bonds listed on the attachment to this Agreement

Schedule, and [Argentina] will not assert that the Holder's claims to any Bonds listed thereon are

untimely, or otherwise time-barred."  Scotch-Marmo Decl. Ex. 8 at Ex. 7 (VR Settlement at §

vii(a)); *id.* at Ex. 8 (Procella Settlement at § vii(a)).  Had Argentina intended its Unilateral

Settlement Offer to exclude interest or principal payments that it now contends are barred by a

(never litigated) statute of limitations defense, it never would have agreed to those riders.  It also

never would have drafted and issued an MSA that expressly refers to contractual prescription

(and not the statute of limitations), and it never would have made the express statements set forth

above to three separate Movants.  Indeed, Argentina's statute of limitations theory was a post-Indicative Ruling innovation, which, as Mr. Bausili candidly confessed to Movants Attestor and Trinity on March 7, 2016, came from "our lawyers."  Bour Decl. ¶ 27.

## ARGUMENT

## I.    LEGAL STANDARD

To obtain a preliminary injunction, a moving party must show:  (1) "a likelihood of success on the merits or . . . sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly in the plaintiff's favor"; (2) a likelihood of "irreparable injury in the absence of an injunction"; (3) that "the balance of hardships tips in the plaintiff's favor"; and (4) that the "public interest would not be disserved." *See Benihana, Inc. v. Benihana of Tokyo, LLC*, 784 F.3d 887, 894-95 (2d Cir. 2015) (internal citations omitted).  The temporary restraining order standard is the same.  *See, e.g., Echo Design Grp. v. Zino Davidoff S.A.,* 283 F. Supp. 2d 963, 966 (S.D.N.Y. 2003).

## II.    MOVANTS SATISFY THE REQUIREMENTS FOR A TEMPORARY RESTRAINING ORDER AND A PRELIMINARY INJUNCTION

### A.    Movants Will Succeed On The Merits

To establish a likelihood of success on the merits, a plaintiff "need not show that success is certain, only that the probability of prevailing is 'better than fifty percent'".  *BigStar Entm't, Inc. v. Next Big Star, Inc.*, 105 F. Supp. 2d 185, 191 (S.D.N.Y. 2000) (quoting *Abdul Wali v. Coughlin*, 754 F.2d 1015, 1025 (2d Cir. 1985)).  While Movants surpass this standard, they can certainly satisfy the alternative test of "sufficiently serious questions going to the merits to make them a fair ground for litigation" given that the balance of hardships stemming from any limited and temporary relief tips decidedly in their favor.  *See Benihana,* 784 F.3d at 894-95 (internal citations omitted); *see also* § II.C.

10

1.    **The Parties Formed Binding Settlement Agreements**

Contracts are formed by offer and acceptance, so when Movants accepted the Unilateral Settlement Offer without modification and provided a list of their bond holdings pursuant to the Instructions, a binding contract was formed.  *See generally Krumme v. WestPoint Stevens Inc.*, 143 F.3d 71, 84 (2d Cir. 1998) (valid contract formed when a party unconditionally accepts an offer without modification).[11]

Under New York law, when a party makes an offer and promises to keep that offer open for a specified period of a time, the offer is irrevocable.  Glen Banks, 28 N.Y. Prac., Contract Law § 26:23 ("An option contract is an enforceable promise not to revoke an offer. . . . If accepted in accordance with its terms during the period it is outstanding, an option will give rise to an enforceable contract").[12]  An "irrevocable offer for a specified period of time, which if accepted in accordance with its terms will . . . give rise to a contract."  *USA Network v. Jones Intercable, Inc.*, 729 F. Supp. 304, 309 (S.D.N.Y. 1990) (internal citations omitted).

At issue here is a written offer drafted entirely by Argentina without negotiation and extended broadly to the public, with deadlines and mechanics for acceptance.  Specifically, Argentina issued "Instructions for Bondholders to Accept its Settlement Proposal," stating that acceptances had to be delivered on a form drafted by Argentina, adopting the economic formulae set out in the Instructions.  Scotch-Marmo Decl. Ex. 6 (Instructions).  The Instructions further provided that "Holders may become a party to a Settlement Agreement by executing and

---

[11] *See also Consarc Corp. v. Marine Midland Bank, N.A.*, 996 F.2d 568, 573 (2d Cir. 1993) ("A unilateral offer may be accepted by the other party's conduct and thereby give rise to contractual obligations"); *Zheng v. City of New York*, 19 N.Y.3d 556 (2012) (contract formed where a party accepted an offer in accordance with its terms).  Here, in virtually every case, Argentina even responded to the submission of Movants' acceptances with an email acknowledging receipt.  *See supra* n.5.

[12] Consideration is not required to make the offer irrevocable.  *Fullerton v. Prudential Life Ins. Co. of Am.*, No. 99 Civ. 4453, 2000 WL 1810099, at *8 (S.D.N.Y. Nov. 30, 2000) (*citing to* N.Y. Gen. Oblig. Law § 5-1109 (McKinney)).

exchanging with the Republic a completed Agreement Schedule, the form of which is attached as Exhibit A to the [MSA]." *Id.* at 2.  In short, Argentina objectively manifested its intent to create an offer by publishing its own "Instructions for Bondholders to Accept" its offer by a specified deadline (February 29, 2016), and Movants accepted by complying with those same Instructions.

That Argentina's Unilateral Settlement Offer constituted the grant of an irrevocable option was underscored by Instruction 5:

> *Injunction Bond Holders that execute and deliver* to the email address included hereby an Agreement Schedule *prior to 5:00 pm New York time on February 19*, 2016 *will have the Settlement Amount* under options (ii) and (iii) of Section 4 above calculated using a discount of 27.5%.  *Those Injunction Bond Holders that execute and deliver* to the email address below an Agreement Schedule *after 5:00 pm New York time on February 19*, 2016 *will have the Settlement Amount* under options (ii) and (iii) of Section 4 above calculated using a discount of 30%.

*Id.* (emphasis added.)

Moreover, Argentina stated on multiple occasions that its offer had a final expiration date of February 29, 2016, and that it would pay any agreements in principle reached by that date.  It proposed to this Court that its payment to any bondholders "who reach[] an agreement in principle with [Argentina] on or before February 29, 2016" should be a condition of vacatur.  *See* Dkt. 863 at 14, 1:08-cv-06978-TPG (Arg. Show Cause Memo. of Law, Feb. 11, 2016).  This Court adopted the suggestion as the second condition precedent in its Indicative Ruling, as well as in its March 2 Order.[13]  In colloquy with Circuit Judge Walker, Argentina's counsel stated that he did not "have authority to extend" the Unilateral Settlement Offer "that expires on [February] 29th."  Scotch-Marmo Decl. Ex. 13 (2/24/2016 Oral Arg. Tr. at 35).[14]  Thus, prior to February 29, 2016, *everyone*, including this Court and the Second Circuit, understood that Argentina's

---

[13] Indicative Ruling, 2016 WL 715732 at *10; March 2 Order, 2016 WL 836773 at *2.

[14] Argentina later stated that the Unilateral Settlement Offer would not expire on February 29th, *see* Dkt. 904 at 2, 1:08-cv-06978-TPG, but this change was not made until after the Movants *already* had *accepted* the offer.

Unilateral Settlement Offer would expire on February 29, 2016.  By conditioning payment on acceptance prior to one of two specified deadlines (either February 19 or February 29), Argentina made clear that acceptance formed a binding contract.

### 2.   Argentina's Conduct Confirms That Delivery Of The Completed Agreement Schedule Formed A Binding Agreement

Argentina's statements and conduct also demonstrates that binding contracts were formed upon Movants' delivery of the executed Agreement Schedules.  *See Tractebel Energy Mktg., Inc. v. AEP Power Mktg., Inc.*, 487 F.3d 89, 97 (2d Cir. 2007) (contract may be "established through the conduct of the parties recognizing the contract") (internal quotations omitted).  For example, Argentina expressly stated to multiple Movants that return of the completed Agreement Schedule would create a binding agreement.  *See* Lee Decl. Ex. 2 (Feb. 17 email from Mr. Bausili) ("Max, we were working on providing the following link and *agreement for you to execute*") (emphasis added); Bour Decl. Ex. 5 (Feb. 19 email from Mr. Bausili) ("The deadline today was for plaintiffs with an Injunction *taking the Injunction Offer*. . . .  If you are saying that you have injunction and would like to *take the Injunction Offer* . . . .") (emphasis added).

In briefing at the Second Circuit, Argentina has tried to re-characterize Movants' acceptances of its offer as "counteroffers" requiring a countersignature before contracts were formed.  *See* Scotch-Marmo Decl. Ex. 12 at 13 n.3; *id.* Ex. 14 (Argentina's Second Cir. Opp. to Motion of *Amici Curiae* Foreign-Law Bondholders, dated Apr. 6, 2016).  But Argentina's own terms did not provide for counteroffers, and requiring a countersignature in an offer "open to all" makes that offer *not* open to all.  Specifically, under the unilateral option contract doctrine, the offeror cannot selectively accept acceptances, thereby "turn[ing] an otherwise straightforward offer into an illusion."  *Wigod v. Wells Fargo Bank, N.A.*, 673 F.3d 547, 563 (7th Cir. 2012); *see also Corvello v. Wells Fargo Bank, NA*, 728 F.3d 878, 883 (9th Cir. 2013), *as amended on reh'g*

*in part* (Sept. 23, 2013) (*per curiam*) (rejecting argument that "there can be no contract unless the servicer sends the borrower a signed Modification Agreement," and finding no bar to a binding contract from language stating "the Loan Documents will not be modified unless and until . . . (ii) [the borrower] receive[s] a fully executed copy of a Modification Agreement"). Upon acceptance of an option contract, the option immediately ripens into a binding, bilateral contract. *Jarecki v. Shung Moo Louie*, 95 N.Y.2d 665, 668 (2001).

That the Instructions stated that the Agreement Schedule would be "countersigned by" Argentina, *see* Scotch-Marmo Decl. Ex. 6 at 2, was not a reservation to not enter an agreement at all; rather, it reserved Argentina's right to confirm that the accepting party's *calculation* of the payment owed conformed to the Unilateral Settlement Offer's formulae.  Paragraphs 4 and 5 of the Instructions directed the accepting bondholder to calculate the amount due at "Closing" under specific formulae.  *See* Scotch-Marmo Decl. Ex. 6.  The bondholder was instructed to type the result of this calculation – the "Settlement Amount" – in paragraph (iv) of the form of Agreement Schedule, append a schedule of its bonds, and submit the package to Argentina at a designated email address by the February 29 deadline.  *Id.*

Because the MSA obliges Argentina to pay the Settlement Amount, the countersignature provision – which, by its terms, applies only to the Agreement Schedule[15] – reflected Argentina's right to check that the Settlement Amount was correctly calculated, and its signature would confirm its agreement to the calculation.  Among other things, this allowed Argentina to check whether, as a matter of arithmetic and the dates of submission, the percentages had been applied correctly to the list of bonds accompanying the acceptance of the offer.  *See* Lee Decl. Ex. 7 (Feb. 18 email from Mr. Bausili) ("We will need to reconcile tomorrow morning. . . . The main

---

[15]  "That Agreement Schedule, when countersigned by the Republic, shall constitute a binding agreement between the parties . . . ." *Id.* at 2.

thing is to match the amount of each bond involved in each docket number"). That is, the countersignature provision allowed Argentina to "check the math," *not* to decide whether or not to form a contract. This is exactly how Argentina construed its Unilateral Settlement Offer prior to its efforts to renege.[16]

Moreover, by its own actions, Argentina showed that it did not see the need of an additional, manual signature beyond the electronic signature – "/s/: Luis A. Caputo, Secretary of Finance" – it included on the face of the Agreement Schedule. Indeed, it submitted the Bausili Decl. to this Court on the eve of the March 1, 2016 hearing, attaching an Agreement in Principle with Red Pines that *lacked* an additional manual signature from Secretary Caputo as a binding contract: it described the document as "a true and correct copy of the ***Agreement in Principle*** between Red Pines LLC and the Republic of Argentina, ***executed as of February 28, 2016***." *See* Scotch-Marmo Decl. Ex. 8 (Bausili Decl. ¶ 13) (emphasis added).[17]

### 3. The Unilateral Settlement Offer Did Not Exclude Bonds Based On Any Statute Of Limitations Defense

Argentina's purported grounds for reneging on at least some aspects of the Settlement Agreements is that some – Argentina never has articulated which – of Movants' claims for defaulted principal and interest are subject to a statute of limitations defense.[18] While Movants dispute that *any* of their claims are time-barred (and note that Argentina has never previously

---

[16] *See* Lee Decl. Ex. 9 ("We will need to however reconcile [ISINS] into cases as mentioned before"); Bour Decl. Ex. 4 ("If you are saying that you have injunction and would like to take the Injunction Offer and we did not have time to reconcile your figures in time, we can consider taking your email as a 'stop of the clock'").

[17] In any event, a binding agreement can be reached without a countersignature even though there is some expectation that the parties will later execute the agreement. *See, e.g.*, *Kowalchuk v. Stroup*, 61 A.D.3d 118, 124-125 (1st Dep't 2009) (language stating that "[t]he Agreement is complete and binding upon its execution by all signatories" was "simply insufficient to be treated as an explicit reservation that the parties should not be bound by the terms of their agreement until the written agreement [wa]s fully executed").

[18] Amazingly, Argentina has not agreed to pay even those claims that it is not now arguing are time-barred.

pressed this argument), that debate is irrelevant to this motion because the Unilateral Settlement Offer drafted by Argentina contains no reference to *any* purported statute of limitations defense. Rather, it excluded only those claims that arise "under defaulted Republic of Argentina bonds as to which the ***contractual prescription period*** set out in the relevant instrument evidencing those bonds has expired."  Scotch-Marmo Decl. Ex. 7 (MSA § 1) (emphasis added).

Pursuant to the FAA (which governs the New York Bonds), contractual "prescription" poses a time limitation from the point when Argentina pays funds owed to the bondholders to its "Fiscal Agent" that are then left unclaimed for two years, whereupon the funds are repaid to Argentina and the bondholder "shall thereafter look only to [Argentina] for any payment to which such holder may be entitled."  Scotch-Marmo Decl. Ex. 1 at § 6(d).  In that scenario – *which has never occurred because Argentina has not delivered the funds to its Fiscal Agent* – the "prescription clause" requires that "claims against [Argentina] for payment in respect of the Securities and interest payments thereon shall be prescribed and become void unless made within 10 years (in the case of principal) and 5 years (in the case of interest) *from the appropriate Relevant Date* in respect thereof."  *Id.* at Ex. A, p. A-17 (emphases added).  The FAA consistently defines "Relevant Date" as "the date on which payment in respect thereof becomes due *or (if the full amount of the money payable on such date has not been received by the Fiscal Agent on or prior to such date*) the date on which notice is duly given to the holders . . . that such moneys have been so received and are available for payment."  *Id.* at § 7 (emphasis added). Because it is undisputed that Argentina has never paid its Fiscal Agent on any of the defaulted New York-law Bonds at issue, the "Relevant Date," and thus the "contractual prescription period," has not been triggered.

The prescription clause of the English-law Trust Deed is similar and also has not been triggered.[19]  While the German-law bond instruments vary, some include a provision that limits Germany's statutory thirty-year prescription period to ten years.  Scotch-Marmo Decl. Ex. 2 at § 8.  However, presentation (which satisfies the prescription requirement under German law) was made on *all* of the German-law Bonds in 2006—well within the period.  *Id.* Ex. 15 (notices confirming that presentment was made for all relevant German-law ISINs).  Thus, the only time-based defense that Argentina purported to reserve – contractual prescription – is inapplicable.

And, prior to obtaining the Indicative Ruling on February 19, 2016, Argentina itself so understood its offer.  On February 12, 2016, Finance Secretary Luis Caputo explained to Mr. Bour of Trinity and Attestor that the limitation in the MSA would be "contractual prescription," and that Mr. Bour "should look at the New York-law bond documents [in some of which] interest payments 'timed out' after five years, and principal after ten years."  Bour Decl. ¶12; *see also* Ehrmann Decl. ¶ 7 (recounting similar conversation with Mr. Bausili on February 16, 2016, wherein Mr. Bausili stated that the New York issuance documents contained language limiting principal to 10 years and interest to 5 years).  In a week of reconciling the figures, Argentina never mentioned the statute of limitations, and accepted a calculation that cannot be reconciled with a statute of limitations concept.  Bour Decl. ¶¶ 15-21.  Argentina also accepted a rider from Honero and other bondholders expressly stating that it "***will not assert that the Holder's claims to any Bonds listed thereon are untimely or otherwise time-barred***."  Lee Decl. Ex. 5.  When Honero sent its Agreement Schedule to Argentina with that rider, Argentina responded, "***We will***

---

[19] The Trust Deed includes a prescription period running from the "Relevant Date."  Scotch-Marmo Decl. Ex. 3 at § 9 (emphasis added).  In the event that "the full amount of the money payable has not been received by the Trustee or the Principal Paying Agent," the "Relevant Date" is "the date on which notice is duly given to the Noteholders . . . that such moneys have been so received and are available for payment."  *Id.* at § 8 (emphasis added).  No such notice has been delivered, and the "Relevant Date" has thus not been triggered.

*be okay with the rider*."  Lee Decl. ¶ 16 & Ex. 9.  Had Argentina believed its offer was subject to

a statute of limitations defense, it *never* would have agreed to that rider.  Further, after the

Indicative Ruling, but before the March 2 Order, Argentina submitted to this Court the VR and

Procella Settlements covering bonds with maturities dating back to 2002 and 2003—which

likewise contained a rider stating that Argentina "will not assert that the Holder's claims to any

Bonds listed thereon are untimely or otherwise time-barred."  Scotch-Marmo Decl. Ex. 8 (Bausili

Decl. Ex. 7 and 8).  Argentina also submitted to this Court the Red Pines Settlement – which it

later reneged-upon – that *also* covered bonds with maturity dates of similar vintage.  *Id.* (Bausili

Decl. Ex. 9).  ***In other words, in order to obtain the judicial relief it wanted, Argentina agreed***

***that the Unilateral Settlement Offer covered claims on bonds that it now contends are subject***

***to a potential statute of limitations argument***.[20]

    Having been caught in an attempt to rewrite its own Unilateral Settlement Offer,

Argentina now contends that the settlements with Procella, VR, and Red Pines were "mistakes."

*See* Scotch-Marmo Decl. Ex. 12 at 13 n.3.  Yet not only has it never informed this Court that the

record it presented in support of its February 25, 2016, motion was misleading, any such

contention would lack credibility.  As Mr. Bausili candidly admitted on March 7, 2016, the

"statute of limitations" was an after-the-fact idea from "our lawyers."  Bour Decl. ¶ 27.

### 4.    Principles Of Contract Interpretation Favor Movants' Reading Of The Unilateral Settlement Offer

    Even if the terms of Argentina's settlement documentation were found to be ambiguous –

and they are not – they would have to be interpreted against Argentina.  The Unilateral

---

[20] Any statute of limitations defense applicable to Movants' claims would also be applicable to VR and Procella's
now-settled claims.  *Compare, e.g.*, Scotch-Marmo Decl. Ex. 8 (Procella Settlement covering bond with ISIN
US040114AH34 and December 20, 2003 maturity date where complaint was filed May 21, 2015) *with id.* Ex. 16
(Compl. Schedule I) (detailing claims asserted by Movants ARAG-A, ARAG-O, ARAG-T, ARAG-V, Attestor,
Trinity, and Yellow Crane based on same bond in complaints filed in recent complaints).

Settlement Offer was drafted entirely by Argentina, without input from or negotiation with Movants.  The principle of *contra proferentem* provides that "equivocal contract provisions are generally to be construed against the drafter."  *McCarthy v. Am. Int'l Grp.*, 283 F.3d 121, 127 (2d Cir. 2002) (citation omitted).  This is particularly true when contracts are drafted without input from the other party.  *See Saks Inc. v. Attachmate Corp.*, No. 14 CIV. 4902, 2015 WL 1841136, at *2 (S.D.N.Y. Apr. 17, 2015).  The rule applies even when the counterparty is sophisticated.  *See Morgan Stanley Grp. v. New England Ins. Co.*, 225 F.3d 270, 279 (2d Cir. 2000).  Thus, any ambiguity must be construed in favor of Movants.

Movants' interpretation also makes logical sense.  Argentina offered its initial Unilateral Proposal "to *all* holders of its government bonds that did not take part in the debt swap transactions carried out in the years 2005 and 2010."  Scotch-Marmo Decl. Exs. 4-5 (Proposal at 1) (emphasis added).  It makes sense that Argentina would seek to settle all claims, including those subject to a potential argument based on statute of limitations, rather than risk the uncertainties of litigating jurisdiction-by-jurisdiction statute of limitations disputes. Indeed, claims get settled all the time where statute of limitations is a contested issue.  What is unacceptable, however, is to renege on a settlement following success in obtaining judicial relief based upon misrepresentations.

## 5.   <u>Argentina Cannot Overcome Judicial Estoppel</u>

Judicial estoppel "prevents a party from prevailing in one phase of a case on an argument and then relying on a contradictory argument to prevail in another phase."  *New Hampshire v. Maine*, 532 U.S. 742, 749 (2001).  This equitable doctrine prevents parties from playing "fast and loose" with the courts, *id.* at 750, and applies where (i) a party's new position is "clearly inconsistent" with its earlier position, (ii) the party persuaded a court to accept its prior position, *id.* at 743, and (iii) that party "would derive an unfair advantage or impose an unfair detriment on

the opposing party if not estopped." *Intellivision v. Microsoft Corp.*, 484 F. App'x 616, 619 (2d Cir. 2012) (internal citations omitted).

These elements are each met here.  First, Argentina's current position that the Unilateral Settlement Offer was subject to the further requirement of a manual countersignature, as well as a statute of limitations defense limitation, contradicts Argentina's representations to this Court that "all bondholders" were free to accept its offer and that each of the VR, Procella and Red Pines Settlements, including the claims that Argentina now argues are time-barred, were "Agreements in Principle."  Argentina's add-on requirement of a manual countersignature is also contradicted by its representation to this Court that it had an "executed" Agreement with Red Pines (which was not manually countersigned).

Second, Argentina persuaded the Court to (conditionally) vacate the Injunctions by touting its supposed settlement momentum.  The Court relied on Argentina's representations that the Unilateral Settlement Offer could be accepted by Movants at any time prior to February 29, 2016, *see* 2016 WL 715732 at **3, 10,  and on Argentina's additional "evidence" of "numerous" Agreements in Principle that it had reached with certain bondholders (including VR, Procella, and Red Pines).  *See* March 2 Order, 2016 WL 836773, at *2.  Indeed, this Court expressly found that these "now signed agreements in principle" "buttress[ed]" its prior finding that vacatur of the Injunctions was appropriate.  *Id.*

Third, it would be manifestly unfair to permit Argentina to argue to the Court that *all* bondholders could accept its offer by February 29, 2016, and have the protections of the Injunctions, only to then avoid its payment obligations by repudiating agreements at will. Argentina should be judicially estopped from denying Movants the protections it promised to those who accepted the Unilateral Settlement Offer by February 29, 2016.

20

B.     <u>**Movants Will Suffer Irreparable Harm Absent Injunctive Relief**</u>

To demonstrate irreparable harm, a plaintiff must show an injury that is "actual and imminent" and "cannot be remedied by an award of monetary damages." *Shapiro v. Cadman Towers, Inc.*, 51 F.3d 328, 332 (2d Cir. 1995) (citation and internal quotation marks omitted). An award of money damages is inadequate "where a non-movant's assets may be dissipated before final relief can be granted, or where the non-movant threatens to remove its assets from the court's jurisdiction, such that an award of monetary relief would be meaningless[.]" *Firemen's Ins. Co. of Newark, New Jersey v. Keating*, 753 F. Supp. 1146, 1153 (S.D.N.Y. 1990) (citation omitted); *see also Itek Corp. v. First National Bank*, 730 F.2d 19, 22–23 (1st Cir. 1984) ("The recent history of relations between Iran and the United States indicates that this remedy is inadequate. [Plaintiff]'s efforts to recover money that [it] is legally owed through the Iranian courts would be futile").

Argentina, of course, is a sovereign with a history of not respecting judgments of U.S. courts. Movants will thus be immediately harmed if the Injunctions are lifted based upon a notification from Argentina that it has paid "all" settling bondholders if Movants have not been paid. In that circumstance, Movants will have no means of protecting themselves from being left with either confirmed Settlement Agreements (if this Court agrees with Movants on the merits of this action), or ultimate money judgments – in either case, binding court rulings – that Argentina will never honor.

These are not idle concerns. Given Argentina's history of defying any money judgment issued by this Court, any confirmation of the binding nature of the Settlement Agreements and any award of monetary damages entered after the *pari passu* Injunctions are lifted will be, at best, a pyrrhic victory. *See* October 30 Order, 2015 WL 6656573 at *4 (recognizing just months ago that money judgments are an inadequate remedy in light of Argentina's defiance); *see Itek*,

21

730 F.2d at 22 (finding irreparable harm where movant's efforts to collect moneys "legally owed" by a recalcitrant sovereign nation "would be futile").  As the Second Circuit has observed, "Argentina will simply refuse to pay any judgments.  It has done so in this case by, in effect, closing the doors of its courts to judgment creditors."  *See NML I*, 699 F.3d at 262; *see also NML II*, 727 F.3d at 241, 247 (Argentina is a 'uniquely recalcitrant debtor" and "the plaintiffs have no adequate remedy at law because [Argentina] has made clear its intention to defy any money judgment issued by this Court").

Self-serving claims by Argentina that it has changed its ways offer no legally cognizable or other comfort to Movants.  Recent actions – including its coercive efforts to steamroll plaintiffs into cram down settlements on "take-it-or-leave-it" terms – only confirms that its inequitable conduct continues unabated.  Indeed, the very structure of Argentina's Unilateral Settlement Offer was coercive and inequitable: it sorted plaintiffs into three groups, to which Argentina would pay differing consideration based on arbitrary factors, such as whether plaintiffs already obtained injunctive relief or whether they "merely" had fully-briefed motions for injunctive relief that are pending before this Court.

In fact, the Unilateral Settlement Offer shares much in common with the coercive features of the 2005 and 2010 Exchange Offers—which this Court found warranted injunctive relief—including (i) the forced application of varying discounts on a take-it-or-leave-it basis; (ii) the threat of not otherwise being paid anything by Argentina; (iii) the use of extreme time pressure; and (iv) a refusal to meaningfully negotiate.  Further, the legislation recently passed by Argentina's lower house and Senate to satisfy one of the conditions set out in the March 2 Order does not address Argentina's refusal to honor money judgments entered by U.S. courts.  *See* http://www.senado.gov.ar/bundles/senadoportal/noticias/PE_01_2016.pdf.

In sum, the behavior that led this Court to grant the Injunctions in the first place has not changed.  The harm that Movants here will suffer absent the requested injunctive relief is no less irreparable than the harm that was being suffered by a larger group of bondholders in 2012 and 2015 when this Court issued the *pari passu* Injunctions.  That there are now a smaller number of bondholders still subject to this same harm does not detract from its irreparable nature.

**C.**      **The Balance Of Hardships Tilts Decidedly Toward Movants**

The balance of the harms decidedly supports injunctive relief.  If Argentina were allowed to walk away from binding Settlement Agreements and unilaterally claim compliance with the second condition precedent, Movants will irrevocably lose the benefit of their bargain and risk never recovering what they are rightfully owed.  Argentina, for its part, will have no incentive to honor its binding Settlement Agreements, to treat similarly-situated bondholders equally, or to respect the orders and money judgments of the U.S. courts.  The self-evident harms that Movants will sustain in that scenario will be further exacerbated when Argentina inevitably begins making payments on the Exchange Bonds and on newly-issued debt in rampant violation of the Equal Treatment Provisions.

By contrast, the potential hardship faced by Argentina if the requested limited injunction were issued would be minimal, temporary, and provisional.  Any injunctive relief would remain in place only through a resolution of the present declaratory judgment action, which Movants are willing to conduct on an expedited basis.  And, nothing prevents Argentina from simply paying Movants under their respective Settlement Agreements and thereby legitimately obtaining its long-desired goal of returning to the global capital markets.

**D.**      **The Public Interest Favors Granting Injunctive Relief**

The public interest also favors holding Argentina to the terms of the offer that it drafted and Movants accepted.  Indeed, the public interest is served by requiring parties that enter

23

binding contracts under New York law, such as the MSA, "to honor [their] terms." *See NML II*, 727 F.3d at 248.[21]  The public interest is also served by safeguarding the integrity of the judicial process.  *See Williams-Yullee v. Florida Bar*, 135 S. Ct. 1656, 1659 (2015) ("Public perception of judicial integrity is accordingly a state interest of the highest order") (internal citation omitted).  When a party parades certain settlement agreements before a Court as grounds for judicial relief, only to then renege on one of them and decline to honor settlements with other similarly-situated bondholders holding the very same rights, it undermines the appearance of fairness that the judicial process is designed to advance.

Movants' requested relief also serves the public interest in judicial economy.  There is a "public interest in promoting settlement of lawsuits," particularly in cases, such as this one, that are complex and labyrinthine.  *See Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96, 117 (2d Cir. 2005) ("The compromise of complex litigation is encouraged by the courts and favored by public policy"); *Janus Films, Inc. v. Miller*, 801 F.2d 578, 583 (2d Cir. 1986) (same); *Flex-Foot, Inc. v. CRP, Inc.*, 238 F.3d 1362, 1369 (Fed. Cir. 2001) ("[E]nforcement of settlement agreements encourages parties to enter into them—thus fostering judicial economy") (internal citation omitted).  Allowing Argentina to renege on the Settlement Agreements would undermine that compelling public policy.

## CONCLUSION

For the foregoing reasons, Movants respectfully request that their motion by order to show cause for the entry of (1) a temporary restraining order pending the resolution of the motion for a preliminary injunction, and, after expedited discovery, (2) a preliminary injunction pending the resolution on the merits of the present action be granted.

---

[21] *See also Weltover, Inc. v. Republic of Argentina*, 941 F.2d 146, 153 (2d Cir. 1991); *M/S Bremen v. Zapata Off-Shore Co.*, 407 U.S. 1, 12-13 (1972) (enforcement of contractual obligations serves the public interest).

Dated:  New York, New York
        April 6, 2016

/s/ Timothy B. DeSieno
Timothy B. DeSieno
Kenneth I. Schacter
Stephen Scotch-Marmo
MORGAN, LEWIS & BOCKIUS LLP
101 Park Avenue
New York, NY 10178
(212) 309-6000
tim.desieno@morganlewis.com

     - and -

Sabin Willett
Christopher L. Carter
MORGAN, LEWIS & BOCKIUS LLP
One Federal Street
Boston, MA 02110
(617) 951-8000
sabin.willett@morganlewis.com

*Counsel for Moving Plaintiffs*

/s/ Brian S. Rosen
Brian S. Rosen
Richard L. Levine
Richard W. Slack
David Yolkut
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
(212) 310-8000
brian.rosen@weil.com

*Counsel for Moving Plaintiffs*