UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ARAG-A LIMITED, ARAG-O LIMITED, ARAG-T LIMITED, ARAG-V LIMITED, ATTESTOR VALUE MASTER FUND LP, BYBROOK CAPITAL HAZELTON MASTER FUND LP, BYBROOK CAPITAL MASTER FUND LP, MCHA HOLDINGS, LLC, TRINITY INVESTMENTS LIMITED, WHITE HAWTHORNE, LLC, WHITE HAWTHORNE II, LLC AND YELLOW CRANE HOLDINGS, L.L.C., <br><br> Plaintiffs, <br><br> -against- <br><br> THE REPUBLIC OF ARGENTINA, <br><br> Defendant. | 16 Civ. 2238 (TPG) |

## DEFENDANT THE REPUBLIC OF ARGENTINA'S MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS' MOTION, BY ORDER TO SHOW CAUSE, FOR A TEMPORARY RESTRAINING ORDER AND A PRELIMINARY INJUNCTION

CRAVATH, SWAINE & MOORE LLP
Worldwide Plaza
825 Eighth Avenue
New York, NY 10019
(212) 474-1000

*Attorneys for Defendant The Republic of Argentina*

April 10, 2016

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................. ii

PRELIMINARY STATEMENT .....................................................1

STATEMENT OF FACTS ...............................................................2

ARGUMENT ..................................................................................6

I.      PLAINTIFFS CANNOT SHOW A LIKELIHOOD OF SUCCESS ON THE
        MERITS BECAUSE THEY DO NOT HAVE ENFORCEABLE
        SETTLEMENT AGREEMENTS WITH THE REPUBLIC. ...................6

        A.      The Countersignature Condition Was Not Fulfilled....................7

        B.      Plaintiffs' Purported "Acceptances" Do Not Even Meet the
                Requirements of the Republic's Settlement Proposal...............12

        C.      The Republic Has Not Reneged on Agreements to Pay Time-Barred
                Claims. ..................................................................16

        D.      Judicial Estoppel Does Not Apply Because the Republic Has Not
                Taken Inconsistent Positions....................................................18

II.     PLAINTIFFS HAVE NOT MADE A SUFFICIENT SHOWING OF
        IRREPARABLE HARM. ....................................................20

III.    THE BALANCE OF THE EQUITIES AND THE PUBLIC INTEREST
        WEIGH AGAINST PLAINTIFFS' REQUESTED RELIEF. .............23

        A.      The Equities Strongly Favor the Republic................................23

        B.      The Public Interest Strongly Weighs Against an Injunction. ...................24

IV.     CONCLUSION.................................................................25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*ACLU v. Clapper*,
    785 F.3d 787 (2d Cir. 2015)...................................................................................24

*Benihana, Inc. v. Benihana of Tokyo, LLC*,
    784 F.3d 887 (2d Cir. 2015)....................................................................................6

*Berman v. Sugo LLC*,
    580 F. Supp. 2d 191 (S.D.N.Y. 2008).........................................................7, 10, 18

*EEOC v. CRST Van Expedited, Inc.*,
    679 F.3d 657 (8th Cir. 2012) .................................................................................20

*Great-West Life & Annuity Ins. Co. v. Knudson*,
    534 U.S. 204 (2002)..................................................................................................6

*Horne v. Flores*,
    557 U.S. 433 (2009)..................................................................................................6

*Intellivision v. Microsoft Corp.*,
    484 F. App'x 616 (2d Cir. 2012) ...........................................................................19

*Itek Corp. v. First Nat'l Bank*,
    730 F.2d 19 (1st Cir. 1984).....................................................................................23

*Kowalchuk v. Stroup*,
    61 A.D.3d 118 (1st Dep't 2009) ..............................................................................6

*King v. King*,
    208 A.D.2d 1143, 1143-44 (3d Dep't 1994).....................................................14, 15

*Longo v. Shore & Reich, Ltd.*,
    25 F.3d 94 (2d Cir. 1994).....................................................................................7, 8

*New Hampshire v. Maine*,
    532 U.S. 742 (2001)................................................................................................19

*NML Capital, Ltd. v. Republic of Argentina*,
    699 F.3d 246 (2d Cir. 2012)..............................................................................22, 23

*NML Capital, Ltd. v. Republic of Argentina*,
    727 F.3d 230 (2d Cir. 2013)...................................................................................22

*Scheck v. Francis*,
    26 N.Y.2d 466 (1970) ..............................................................................................7

*Wigod v. Wells Fargo Bank, N.A.*,
   673 F3d 547 (7th Cir. 2012) ....................................................................................7

*Winter v. NRDC*,
   555 U.S. 7 (2008) ......................................................................................................6

**Statutes & Rules**

Cód. Civ. 3947-4043 ......................................................................................................17

La. Stat. Ann. §§ 9:5601-9:5701 ..................................................................................17

P.R. Laws Ann. tit. 31 § 5291 ......................................................................................17

**Other Authorities**

11A Charles Alan Wright & Arthur R. Miller, *Federal Practice and
   Procedure* § 2942 (3d ed. 2015) .............................................................................6

22 N.Y. Jur. 2d Contracts §§ 9, 31.................................................................................7

Defendant respectfully submits this Memorandum of Law in Opposition to Plaintiffs' Motion, By Order to Show Cause, For a Temporary Restraining Order and a Preliminary Injunction.

## PRELIMINARY STATEMENT

Plaintiffs request injunctive relief premised on their contention that they entered into enforceable settlement agreements with the Republic of Argentina (the "Republic").  Simply put, no such settlement agreements exist, and the Court must therefore deny Plaintiffs' motion. Plaintiffs never had binding settlement agreements with the Republic because they never received countersignatures from the Republic, and the exchange of such countersignatures was expressly required by the terms of the Proposal in order for a binding settlement to exist.  Such requirements that a contract must be signed in order to be enforceable have been upheld by New York courts for decades, and in this case the countersignature requirement was also eminently sensible because, until the Republic could review and reconcile a bondholder's submission of settlement materials, there could be no meeting of the minds regarding the bonds at issue and the amount to be paid.

Moreover, even if the settlement Proposal issued by the Republic was deemed an offer that could be accepted unilaterally by bondholders such as Plaintiffs—and such an interpretation is directly contrary to the plain language of the Proposal and Instructions issued by the Republic—the Plaintiffs' purported "acceptances" in fact did not comply with the terms of the Republic's Proposal and thus cannot possibly have resulted in a binding agreement under any set of rules.  Plaintiffs therefore have no likelihood of success on the merits and cannot make a sufficient showing of irreparable harm.  The equities and public interest also strongly weigh against an injunction because granting Plaintiffs the relief that they request would threaten the extensive progress that the Republic has made to resolve its defaulted debt obligations to finally

settle this protracted dispute with numerous other bondholders—including some who only a few days ago were plaintiffs in this very case.  Plaintiffs should not be permitted to blow up the extensive progress made to date in an effort to obtain more favorable settlement terms.

## STATEMENT OF FACTS

Plaintiffs are holders of certain defaulted Argentine bonds.  (Am. Compl. ¶ 1.) On February 5, 2016, the Republic issued a public settlement proposal (the "Proposal") in an effort to cancel its defaulted debt.  (Paskin Decl. Ex. 1.)[1]  The Proposal provides for different ways to calculate settlement amounts depending on whether bondholders obtained Injunctions from this Court.  (*Id*. at 2.)  Under the Proposal, bondholders without Injunctions are eligible to receive the amount of original capital owed plus 50% of that original capital amount for bonds reconciled and accepted by the Republic.  (*Id*.)  In contrast, bondholders with Injunctions have their choice between that option and receiving either (1) 100% of any monetary judgments issued prior to February 1, 2016, less a discount of 30%; or (2) the accrued value of any claim for which a monetary judgment was not issued as of February 1, 2016, less a discount of 30%.  (*Id*.) Injunction holders were also eligible to receive an additional amount if they reached agreements in principle with the Republic on or before February 19, 2016.  (*Id*.)  The Proposal also states that "it is contemplated that the amounts of capital and/or interest of the bonds that have been prescribed according to the contractual terms and the applicable laws will not be acknowledged". (*Id*.)[2]

On February 17, 2016, the Republic posted on its website Instructions for Bondholders to Accept its Settlement Proposal (the "Instructions").  (Am. Compl. ¶ 61.)  The

---

[1] References to "Paskin Decl." are to the Declaration of Michael A. Paskin, filed April 6, 2016.  (ECF No. 30.)

[2] In Spanish, the Proposal states:  "[S]e contempla que los montos de capital y/o intereses de los bonos que hayan prescriptos conforme los términos contractuales y la normativa aplicable no serán reconocidos."  (Paskin Decl. Ex. 1 at 4.)

Republic also posted on that date a Master Settlement Agreement (the "Master Settlement Agreement") with an appended form of Agreement Schedule (the "Agreement Schedule").  (*Id.*) Those documents explain in detail the materials bondholders were required to submit to the Republic and the procedural steps required to reach a binding settlement agreement with the Republic:

- The Instructions state that "Holders may become a party to a Settlement Agreement *by executing and exchanging with the Republic* a completed Agreement Schedule".  (Paskin Decl. Ex. 2 at 1 (emphasis added).)

- The Instructions further provide:  "That Agreement Schedule, *when countersigned by the Republic*, shall constitute a binding agreement between the parties to settle all claims in respect of the bonds on the terms contained in the Master Settlement Agreement".  (Paskin Decl. Ex. 2 at 2) (emphasis added).)

- The Master Settlement Agreement states that it "is made[] in accordance with the terms of the Proposal . . . between the Republic of Argentina (the 'Republic') and the Holder identified in item (i) of the Agreement Schedule signed by the parties in connection with this Agreement (such Agreement Schedule, *when executed and exchanged by the Republic and the Holder*, being an integral part of this Settlement Agreement)."  (Paskin Decl. Ex. 3 at 1 (emphasis added).)

- The Master Settlement Agreement further defines the "Agreement Schedule" as "*the completed Agreement Schedule signed (and exchanged) by the Holder and the Republic in the form set out as Exhibit A to this Agreement*".  (Paskin Decl. Ex. 3 at 1 (emphasis added).)

- The Agreement Schedule states on the signature page that "*[b]y executing counterparts of this Agreement Schedule* in the space provided below and *exchanging those counterparts*, the parties agree to be bound by the terms of the Settlement Agreement, as completed by the information contained in this Agreement Schedule".  (Paskin Decl. Ex. 4 at 3 (emphasis added).)

Accordingly, *each* of the documents that set forth the details of the Republic's proposed settlement—the Instructions, the Master Settlement Agreement and the Agreement Schedule—expressly provided that the Republic's countersignature on the Agreement Schedule was required in order to form a binding settlement agreement.

3

The Plaintiffs made the following submissions of proposed settlement materials to the Republic:

- Plaintiff ARAG-A Limited ("ARAG-A") submitted Agreement Schedules with respect to its New York and foreign-law bonds on February 29, 2016. (Am. Compl. ¶ 80; Korkmaz Decl. Exs. 4, 5.) ARAG-A indicated it was submitting one Agreement Schedule with respect to "Injunction Offer Bonds". (Korkmaz Decl. Ex. 5 at 2.) However, only six of the 11 ISINs listed by ARAG-A in the attached list of bonds had associated cases in which Injunctions were issued. (Korkmaz Decl. Ex. 5 at 5.)

- Plaintiff ARAG-O Limited ("ARAG-O") submitted Agreement Schedules with respect to its New York and foreign-law bonds on February 29, 2016. (Am. Compl. ¶ 82; Korkmaz Decl. Exs. 4, 5.) ARAG-O indicated it was submitting one Agreement Schedule with respect to "Injunction Offer Bonds". (Korkmaz Decl. Ex. 5 at 6.) However, only six of the 12 ISINs listed by ARAG-O in the attached list of bonds had associated cases in which Injunctions were issued. (Korkmaz Decl. Ex. 5 at 9.)

- Plaintiff ARAG-T Limited ("ARAG-T") submitted Agreement Schedules with respect to its New York and foreign-law bonds on February 29, 2016. (Am. Compl. ¶ 84; Korkmaz Decl. Exs. 4, 5.) ARAG-T indicated it was submitting one Agreement Schedule with respect to "Injunction Offer Bonds". (Korkmaz Decl. Ex. 5 at 10.) ARAG-T incorrectly listed the docket number for one of its bonds. Further, only six of the 12 ISINs listed by ARAG-T in the attached list of bonds had associated cases in which Injunctions were issued. (Korkmaz Decl. Ex. 5 at 13.)

- Plaintiff ARAG-V Limited ("ARAG-V") submitted Agreement Schedules with respect to its New York and foreign-law bonds on February 29, 2016. (Am. Compl. ¶ 86; Korkmaz Decl. Exs. 4, 5.) ARAG-V indicated it was submitting one Agreement Schedule with respect to "Injunction Offer Bonds". (Korkmaz Decl., Ex. 5 at 14.) However, only three of the 12 ISINs listed by ARAG-V in the attached list of bonds had associated cases in which Injunctions were issued. (Korkmaz Decl. Ex. 5 at 17.)

- Plaintiff Yellow Crane Holdings, L.L.C. ("Yellow Crane") submitted Agreement Schedules with respect to its New York and foreign-law bonds on February 29, 2016. (Am. Compl. ¶ 88; Ehrmann Decl. Exs. 5-7.) Yellow Crane submitted 11 Agreement Schedules with respect to "Injunction Offer Bonds". (Ehrmann Decl. Ex. 7.) However, none of the bonds listed in those 11 Agreement Schedules had associated cases in which Injunctions were issued. (Ehrmann Decl. Ex. 7.)

- Plaintiff Trinity Investments Limited ("Trinity") submitted Agreement Schedules with respect to its New York and foreign-law bonds on February 29, 2016. (Am. Compl. ¶ 89; Bour Decl. Ex. 8 at 10-31.)

4

- Plaintiff Attestor Value Master Fund ("Attestor") submitted an Agreement Schedule with respect to its New York-law bonds on February 29, 2016.  (Am. Compl. ¶ 91; Bour Decl. Ex. 8 at 8.)  Attestor indicated it was submitting its Agreement Schedule with respect to "Injunction Offer Bonds".  (Bour Decl. Ex. 8 at 5.)  Attestor incorrectly listed the docket number for its Injunction bonds and included an ISIN with an incorrect character.  (Bour Decl. Ex. 8 at 8.)

- Plaintiff White Hawthorne, LLC ("White Hawthorne") submitted two Agreement Schedules with respect to its New York-law bonds on February 29, 2016.  (Am. Compl. ¶ 97; Kolatch Decl. Exs. 2, 3.)  White Hawthorne calculated the settlement amount for its seven non-Injunction bonds based upon the "Injunction Offer Bonds" provision, but did not indicate whether the bonds were being submitted as "Injunction Offer Bonds" or "Standard Offer Bonds".  (Kolatch Decl. ¶ 12.)  Upon request for clarification, White Hawthorne submitted a revised Agreement Schedule indicating it was seeking the Injunction Offer for all seven bonds without Injunctions.  (Kolatch Decl. Ex. 7 at 3.)

- Plaintiff White Hawthorne II, LLC ("White Hawthorne II") submitted an Agreement Schedule with respect to one New York-law bond on February 29, 2016.  (Am. Compl. ¶ 93; Kolatch Decl. Ex. 1.)  White Hawthorne II calculated its settlement amount for its non-Injunction bond based upon the "Injunction Offer Bonds" provision, but did not indicate whether the bonds were being submitted as "Injunction Offer Bonds" or "Standard Offer Bonds".  (Kolatch Decl. ¶ 13.)  Upon request for clarification, White Hawthorne II submitted a revised Agreement Schedule indicating it was seeking the Injunction Offer for its bond without an Injunction.  (Kolatch Decl. Ex. 8 at 3.)

- Plaintiffs Bybrook Capital Master Fund LP and Bybrook Capital Hazelton Master Fund LP (together, the "Bybrook Plaintiffs") submitted Agreement Schedules with respect to their New York-law bonds on February 29, 2016.  (Am. Compl. ¶ 97; Dafforn Decl. Ex. 1.)  The Bybrook Plaintiffs indicated they were submitting their Agreement Schedules with respect to "Injunction Offer Bonds". (Dafforn Decl. Ex. 1 at 7, 16.)  However, only 12 of the 14 ISINs listed by the Bybrook Plaintiffs in the attached list of bonds had associated cases in which Injunctions were issued.  (Dafforn Decl. Ex. 1 at 10, 19.)

- Plaintiff MCHA Holdings, LLC submitted an Agreement Schedule with respect to its New York and foreign-law bonds on February 28, 2016.  (Am. Compl. ¶ 99; Krause Decl., Ex. 1.)

It is undisputed that the Republic did not countersign any of the above-mentioned Agreement Schedules, and Plaintiffs do not allege otherwise.

## ARGUMENT

Injunctive relief is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief". *Winter v. NRDC*, 555 U.S. 7, 22 (2008). That is particularly true when the party to be enjoined is a public official or sovereign government. *See Horne v. Flores*, 557 U.S. 433, 448-50 (2009); 11A Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2942 (3d ed. 2015). Moreover, equitable relief is traditionally unavailable in a contract action "to decree specific performance of a contract to transfer funds". *See Great-West Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 210-11 (2002). "A party seeking a preliminary injunction must demonstrate:  (1) a likelihood of success on the merits or . . . sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly in the plaintiff's favor; (2) a likelihood of irreparable injury in the absence of an injunction; (3) that the balance of hardships tips in the plaintiff's favor; and (4) that the public interest would not be disserved by the issuance of an injunction". *Benihana, Inc. v. Benihana of Tokyo, LLC*, 784 F.3d 887, 895 (2d Cir. 2015) (internal quotation marks omitted).

## I.   PLAINTIFFS CANNOT SHOW A LIKELIHOOD OF SUCCESS ON THE MERITS BECAUSE THEY DO NOT HAVE ENFORCEABLE SETTLEMENT AGREEMENTS WITH THE REPUBLIC.

Plaintiffs' request for injunctive relief should be rejected because they cannot show even a "sufficiently serious question[] going to the merits" on their claim to have enforceable settlement agreements. *Benihana,* 784 F.3d at 894-95. As a matter of black-letter contract law, Plaintiffs do not have enforceable agreements with the Republic.

In order "[t]o establish the existence of an enforceable agreement, a plaintiff must establish an offer, acceptance of the offer, consideration, mutual assent, and an intent to be bound. That meeting of the minds must include agreement on all essential terms." *Kowalchuk v.*

*Stroup*, 61 A.D.3d 118, 121 (1st Dep't 2009) (citing 22 N.Y. Jur. 2d Contracts §§ 9, 31).[3]  In

addition, "if the parties to an agreement do not intend it to be binding upon them until it is

reduced to writing and signed by both of them, they are not bound and may not be held liable

until it has been written out and signed."  *Scheck v. Francis*, 26 N.Y.2d 466, 469-70 (1970); *see

also Longo v. Shore & Reich, Ltd*., 25 F.3d 94, 97 (2d Cir. 1994).

           Plaintiffs are unable to establish that their submissions formed binding contracts

with the Republic because (1) the express condition that the Republic countersign and exchange

with the settling bondholders any submitted Agreement Schedules (the "Countersignature

Condition") was not fulfilled; and (2) even assuming the Republic's Proposal could be deemed

an "offer" (and it cannot), there was no meeting of the minds because Plaintiffs' purported

"acceptances" did not comply with the terms of the Proposal.

### A.    The Countersignature Condition Was Not Fulfilled.

           Plaintiffs failed to meet the express condition that they exchange signed

agreements with the Republic.  For decades, New York courts have enforced the rule that if

obtaining signatures is a condition precedent to forming an agreement, the "parties are not bound

and may not be held liable until it has been written out and signed".  *Scheck*, 26 N.Y.2d at 469;

*Berman v. Sugo LLC*, 580 F. Supp. 2d 191, 203 (S.D.N.Y. 2008).  In *Scheck*, the New York

Court of Appeals held that a cover letter which required both parties to sign "evidence[d] the

intention of the parties not to be bound until the agreements were signed".  *Id*. at 469-70.[4]

---

[3] The purported Settlement Agreements are governed by New York law.  (Paskin Decl.
Ex. 3 ¶ 8.)

[4] In fact, even the authority that Plaintiffs cite supports this position.  In *Wigod v. Wells
Fargo Bank, N.A.*, for example, the Seventh Circuit stated that "[c]ertainly, when the promisor
conditions a promise on his own future action or approval, there is no binding offer", that "[a]
condition of subsequent approval by the promisor in the promisor's sole discretion gives rise
to no obligation", and that "[a] manifestation of willingness to enter into a bargain is not an offer if
the person to whom it is addressed knows or has reason to know that the person making it does

Similarly, in *Longo*, the defendant sent an unexecuted employment agreement to an employee and included a letter stating that the employee should return the signed agreement so it could be signed by the defendant.  25 F.3d at 96.  The employee signed and returned the document but the defendant did not countersign it.  *Id*.  The Second Circuit held, as a matter of law, that the letter "evidenced an intent that the parties would not be bound to the terms of their negotiations until the agreement was signed", and there was no binding agreement because it had not been countersigned.  *Id*. at 97.  Indeed, that was the result required by New York law even though the unsigned agreement was "fully and finally negotiated by the parties".  *Id*.  Here, by contrast, the Republic and bondholders plainly did not come to a meeting of the minds on all material terms, including whether the Injunction Offer in the Proposal could apply to Plaintiffs' bonds for which no Injunction had been issued and whether Plaintiffs' claims in connection with certain bonds were time-barred.

The unilaterally submitted documents that Plaintiffs now assert constitute binding agreements plainly stated, several times, that an agreement would exist only after both parties exchanged signatures on the Agreement Schedule:

- The Instructions accompanying the form state:  "Holders may become a party to a Settlement Agreement *by executing and exchanging with the Republic* a completed Agreement Schedule" and any "Agreement Schedule, *when countersigned by the Republic*, shall constitute a binding agreement between the parties to settle all claims in respect of the bonds on the terms contained in the Master Settlement Agreement".  (Paskin Decl. Ex. 2 at 1-2 (emphasis added).)

- The Master Settlement Agreement provides that the "Agreement Schedule[,] *when executed and exchanged by the Republic and the Holder*[] [is] an integral part of this Settlement Agreement".  (Paskin Decl. Ex. 3 at 1 (emphasis added).)

- The Master Settlement Agreement further provides that the definition of "'Agreement Schedule' means the *completed Agreement Schedule signed (and*

not intend to conclude a bargain until he has made a further manifestation of assent".  673 F.3d 547, 561 (7th Cir. 2012).

*exchanged) by the Holder and the Republic*".  (Paskin Decl. Ex. 3 at 1 (emphasis added).)

- The Agreement Schedule also contains spaces for each bondholder to list their bonds and to state the settlement amount as "*reconciled between the Republic and the Holder*".  (Paskin Decl. Ex. 4 at 1-2 (emphasis added).)

- The Agreement Schedule further states on the signature page that "[*b]y executing counterparts of this Agreement Schedule in the space provided below and exchanging those counterparts*, the parties agree to be bound by the terms of the Settlement Agreement, as completed by the information contained in this Agreement Schedule".  (Paskin Decl. Ex. 4 at 3 (emphasis added).)

The Republic engaged in this reconciliation and countersigning process with all creditors that submitted Agreement Schedules and reached settlement agreements with the Republic.  And, given the parties' current dispute regarding whether certain claims might be time-barred and Plaintiffs' improper attempt to obtain settlements under the Injunction Offer for bonds on which they had not obtained Injunctions, it is crystal clear that the Countersignature Condition served a critical and substantive purpose in this case.

There is no dispute that the Countersignature Condition was not satisfied—and Plaintiffs do not even attempt to argue otherwise.  Instead, Plaintiffs advance arguments for why the Court should ignore the express conditions that are stated unambiguously over and over in the detailed documents reflecting the Republic's Settlement Proposal.  All of those arguments are without merit and should be rejected.

*First*, Plaintiffs contend that the Republic "expressly stated to multiple Movants that return of the completed Agreement Schedule would create a binding agreement".  (Pls.' Mem. at 13.)  The communications Plaintiffs cite, however, do not support this conclusion.  In the first email on which Plaintiffs rely, the Republic merely stated that it was "providing the following link and agreement to execute".  (*Id*.)  Plaintiffs argue that this email meant that Plaintiffs' execution of the agreement was all that was needed in order for it to be enforceable,

9

but the email does not say anything of the sort.[5]  (*See id.*)  Although the email says that the bondholders must execute the agreement, which they of course must do to create an agreement, it does not say that the Republic's signature was not required.  In another email, the Republic stated that "[t]he deadline today was for plaintiffs with an Injunction taking the Injunction Offer . . . ."  (Pls.' Mem. at 13.)  The reference to "Injunction Offer" referred to one of the proposed methodologies for calculating the settlement amount that was available to bondholders holding Injunctions, not an indication that the Republic somehow intended to forego the specific and mandatory reconciliation and countersignature requirements the documents expressly required before any binding agreement was formed.  In any event, even if these communications meant what Plaintiffs say they do—and they do not—there would still be no enforceable agreement as a matter of law.  *See Berman*, 580 F. Supp. at 203 ("If, however, either party communicates an intent not to be bound until an agreement is fully executed, no amount of negotiation or oral agreement to specific terms will result in the formation of a binding contract.").

    *Second*, Plaintiffs argue that the Republic is prevented from characterizing Plaintiffs' alleged acceptances as "counteroffers", which it alleges the Republic did, because the Settlement Proposal did not contemplate the existence of any such counteroffers.  (Pls.' Mem. at 13.)  However, the Republic did not assert that the Plaintiffs' submissions were "counteroffers" in the briefs cited by Plaintiffs (*see* Scotch-Marmo Decl. Exs. 12, 14); it merely said that no agreement was reached with Plaintiffs because the Countersignature Condition was never satisfied.  Indeed, regardless of whether Plaintiffs' submissions of settlement materials are viewed as "counteroffers" or simply "offers", the fact remains that there could have been no

---

[5] Plaintiffs' contention (*see* Pls.' Mem. at 11 n.11) that the Republic somehow manifested assent when it "acknowledge[d] receipt" of their submissions does not make sense.

agreements because the express Countersignature Condition had not been satisfied and because there was not yet agreement on all material terms.

*Third*, Plaintiffs assert that the Countersignature Condition "was not a reservation to not enter an agreement at all; rather, it reserved Argentina's right to confirm that the accepting party's *calculation* of the payment owed conformed to the Unilateral Settlement Offer's formulae". (Pls.' Mem. at 14 (emphasis in original).)  In support of that argument, Plaintiffs contend that the countersignature was limited to the agreement of the payment sum because the countersignature "by its terms, applies only to the Agreement Schedule".  *Id*.

The assertion that the Countersignature Condition was limited to the contents of the Agreement Schedule is false; the countersignature provision in the form Agreement Schedule explicitly states that it applies to both the Agreement Schedule <u>and</u> the Settlement Agreement: "By executing counterparts of this Agreement Schedule in the space provided below and exchanging those counterparts, the parties *agree to be bound by the terms of the Settlement Agreement*".  (Paskin Decl. Ex. 4 at 3 (emphasis added).)  The Republic therefore reserved the right not to be bound by any part of the settlement if it chose not to execute and exchange the counterparts; it was not limited to merely approving or disapproving the claimed sums. Plaintiffs' references to additional emails from the Republic referring to the need to confirm the calculations are unavailing because they merely state that the sums need to be confirmed, not that the parties had reached a binding agreement even in the absence of reconciliation and countersigning.  (*See* Pls.' Mem. at 14.)

Furthermore, even if Plaintiffs were correct that the countersignature requirement only protects the Republic's ability to "check the math" (Pls.' Mem. at 15), the Republic is entitled to reject the Agreement Schedule if it disagrees with that math.  The Republic has made

clear that the reason it did not countersign Plaintiffs' submissions was because it disagrees with Plaintiffs' calculations.[6]  Therefore, even if this Court were to accept Plaintiffs' unfounded characterization of the Countersignature Condition, the result is the same:  the lack of a countersignature by the Republic precludes the formation of an enforceable agreement.

*Fourth*, Plaintiffs argue that the Republic did not need to countersign the Agreement Schedule because Mr. Caputo had already signed it electronically.  (Pls.' Mem. at 15.)  However, the "/s/", which was present on the signature line for both the Republic and the bondholder and was printed on the form documents before they were sent to any bondholder, only indicated where each party should sign, not that they both had already signed.  (*See* Paskin Decl. Ex. 4 at 3; *id.*, Ex. 5 at 8.)  Consistent with that basic understanding, many Plaintiffs placed their handwritten signatures next to the "/s/" symbol.  (*See e.g.*, Paskin Decl. Ex. 5 at 8; *id.* Ex. 6 at 3; *id.* Ex. 7 at 8.)

The Countersignature Condition expressly conditioned the existence of a binding agreement upon the Republic countersigning and exchanging the Agreement Schedule with Plaintiffs.  Because that did not happen, there was no agreement reached with any of the Plaintiffs, and Plaintiffs' arguments that the Court should ignore the Countersignature Condition are unavailing.

**B.     Plaintiffs' Purported "Acceptances" Do Not Even Meet the Requirements of the Republic's Settlement Proposal.**

Plaintiffs argue that the Republic's settlement Proposal (which they rename the "Unilateral Settlement Offer" (Pls.' Mem. at 6)) was an irrevocable offer that was accepted by each Plaintiff's submission of an Agreement Schedule.  (*Id.* at 11-12.)  As an initial matter,

_____

[6] Certain plaintiffs also submitted Agreement Schedules with incorrect or missing information.  As discussed below in Part I.B, those missing material terms also precluded the formation of an enforceable contract.

Plaintiffs' characterization of the Republic's Proposal as an "irrevocable offer" that could be unilaterally accepted to create a binding agreement is directly contradicted by the express Countersignature Condition.  As a matter of basic New York contract law, the Republic's countersignature was required, and without it there was no agreement.  (*See supra Part* I.A.)

In any event, Plaintiffs' attempt to characterize the Republic's Proposal as an irrevocable option contract because the Republic allegedly "promise[d] to keep that offer open for a specified period" (*i.e.*, until February 29) fails.  (Pls.' Mem. at 11-12.)  The Proposal and accompanying documents do not state that they are irrevocable.  Indeed, Plaintiffs have mischaracterized the import of February 29 and are wrong in stating that the Proposal has an "expiration date".  (*See* Pls.' Mem. at 12-13.)  The Proposal does not have and has never had an expiration date, and it remains open today.[7]  Further, the Republic has in no way "condition[ed] payment" (*see* Pls.' Mem. at 13) on acceptance by a certain date.  Rather, the Republic has made clear that it intends to honor all settlement agreements reached with bondholders, including those entered into after February 29, as evidenced by the Republic's continuing settlements with bondholders, including former plaintiffs in this action.  As the Republic has explained (*see* No. 08 Civ. 6978, ECF. No. 904 at 2), the February 29 date merely signifies that any bondholder that possesses an Injunction against the Republic and has reached an agreement to settle with the Republic by that date must be paid as a precondition to vacating the Injunctions.  A specific date for the early payment obligation is necessary because it identifies the settlements of Injunction cases that would need to be paid for the Republic to satisfy its obligations under this Court's

---

[7] Plaintiffs are also wrong that the Republic "change[d]" its position on the expiration date. (*See* Pls.' Mem. at 12 n.14.)  No "expiration date" was included in the Republic's Proposal and accompanying documents.

March 2 Order.[8]  (*See* Op. & Order at 3-5, Mar. 2, 2016, ECF No. 912 (hereinafter "March 2 Order").)  In addition, the reference in the Proposal to February 19 also did not constitute a promise to keep the Proposal open until that date, but was only an enticement to provide bondholders who settled before that early date with additional compensation.  (*See* Mem. & Order at 12, Mar. 7, 2016, ECF No. 33.)  The Republic has passed legislation to give the government authority to settle additional claims submitted after February 29.  (*See* Hernández Decl. Ex. 1.)

Moreover, even if the Proposal could be construed as an "irrevocable offer"—and it cannot—Plaintiffs have failed to "accept" the Proposal in accordance with its terms.  Under New York law, "in order for an acceptance to be effective, it must comply with the terms of the offer and be clear, unambiguous and unequivocal." *King v. King*, 208 A.D.2d 1143, 1143-44 (3d Dep't 1994).  Contrary to Plaintiffs' claim that they "accepted the Unilateral Settlement Offer without modification", (Pls.' Mem. at 11), their purported acceptances did not comply with the terms of the Republic's Proposal.  Plaintiffs' submissions conflicted with the terms of the Proposal and accompanying documents in at least two material ways.

*First*, some of Plaintiffs' submissions incorrectly sought the Republic's Injunction Offer for bonds in cases where no Injunction had been issued.  The Republic's Proposal permitted bondholders who held Injunctions to select between a Standard Offer and an Injunction Offer.  Some of these Plaintiffs, however, requested the Injunction Offer for bonds

---

[8] Contrary to Plaintiffs' suggestion, the Republic's counsel did not state to the Second Circuit that the Republic's Proposal would expire on February 29.  Judge Walker asked a question concerning whether counsel had the authority "to extend that offer" beyond February 29, and counsel stated that he "did not".  (Scotch-Marmo Decl. Ex. 13 at 35.)  The deadline that was being discussed was the deadline for bondholders holding Injunctions to enter into a settlement agreement to gain the protection of being paid as a precondition to vacatur of the Injunctions, not a deadline to enter a settlement.

that were not covered by Injunctions and so were ineligible for that option under the terms of the

Proposal.  (*See supra* pp. 4-5.)  For example, the ARAG Plaintiffs indicated they were

submitting their Agreement Schedules with respect to "Injunction Offer Bonds"; however, only

21 of the 47 ISINs submitted by the ARAG Plaintiffs were eligible to receive the Injunction

settlement.  (Korkmaz Decl. Ex. 5 at 5, 9, 13, 17.)  Similarly, the Bybrook Plaintiffs indicated

they were eligible for the Injunction bond rate when that was the case for only 12 of the 14 bonds

submitted.  (Dafforn Decl. Ex. 1 at 10, 19.)  Two of the three Agreement Schedules submitted by

White Hawthorne and White Hawthorne II claimed to append "Injunction Offer Bonds" without

indicating any bonds eligible for such treatment; these Plaintiffs concede as much in their filings

to this Court.  (Kolatch Decl. ¶¶ 12, 13; *id*. Exs. 7, 8.)  In listing ISINs that were ineligible as

"Injunction Offer Bonds", Plaintiffs failed to "comply with the terms of the offer".  *King*, 208

A.D.2d at 1143-44.[9]

       *Second*, Plaintiffs' submission included certain claims that the Republic believes

to be time-barred, which are ineligible per the terms of the Proposal.  The Republic's Proposal

stated, in Spanish, that "it is contemplated that the amounts of capital and/or interest of the bonds

*that have been prescribed* according to the contractual terms *and the applicable laws* will not be

acknowledged".  (Paskin Decl. Ex. 1 at 2) (emphasis added); *see id*. at 4 ("[S]e contempla que

los montos de capital y/o intereses de los bonos que hayan prescriptos conforme los términos

contractuales y la normativa aplicable no serán reconocidos.").  The Master Settlement

Agreement the Republic published on February 17, in turn, incorporated the terms that had been

---

[9] Whether Plaintiffs' attempt to obtain the Injunction Offer for non-Injunction bonds was an innocent mistake or a deliberate effort to obtain consideration beyond what the Proposal called for is irrelevant.  The existence of those errors in Plaintiffs' submission highlights the fact that it would be nonsensical to conclude that the mere submission of their materials to the Republic, with no review, reconciliation or countersignature by the Republic, resulted in a binding agreement.

set forth in the Proposal, including the exclusion of time-barred claims, by stating that it is made "in accordance with the terms of the Proposal . . .".  (*Id*. Ex. 3 at 1).  The Plaintiffs' moving papers do not even address the effect of this term in the Proposal, even though the Republic called their attention to it in its Memorandum in Support of its Motion to Dismiss.  (Mem. Supp. Mot. to Dismiss at 4 n.2, No. 16 Civ. 2238, Apr. 6, 2016, ECF No. 29.)  This is an independent reason Plaintiffs' attempt to establish that they "accepted" the Republic's purported "offer" fails.

The issue of whether the statute of limitations applies to Plaintiffs' bonds is not before the Court.  However, the Proposal clearly indicated that the Republic would not recognize claims it believed were barred by applicable statutes of limitations from the settlement amounts it agreed to pay.  Plaintiffs may disagree with the Republic's belief that their claims are time-barred, but that disagreement demonstrates that the parties did not actually form a meeting of the minds concerning material settlement terms and illustrates why the Republic made a countersignature critical to the formation of an enforceable agreement.

### C.     The Republic Has Not Reneged on Agreements to Pay Time-Barred Claims.

The motion before this Court concerns whether the parties reached enforceable agreements in the first place, not how much is owed under bonds held by Plaintiffs.  The Plaintiffs spend many pages on an irrelevant digression concerning whether or not they have asserted claims that are time-barred.  They ignore, however, the plain terms of the Proposal that state the Republic's position excluding claims that are time-barred, whether by contractual prescription or applicable statutes of limitations.  The parties' disagreement about the settlement amount the Republic committed to pay only shows that the Republic and Plaintiffs failed to reach a meeting of the minds on the material terms of an agreement.

Plaintiffs' argument that the Republic has "reneged" on agreements is based on the assumption that the settlement documents "drafted by Argentina contain[] no reference to

*any* purported statute of limitations defense" and that the only time limitation imposed upon their claims must be found within the contractual prescription period in the bond documents.  (Pls.' Mem. at 16.)  That assumption is simply a fallacy.

As discussed above, the Republic's proposal stated that the amounts of capital and/or interest of the bonds "*that have been prescribed* according to the contractual terms *and the applicable laws* will not be acknowledged".  (Paskin Decl. Ex. 1 at 2.)  The Master Settlement Agreement in turn incorporated the terms that had been set forth in the Republic's Proposal, including the exclusion of time-barred claims.  Plaintiffs instead focus on the contractual prescription periods included in the bonds themselves, ignoring or choosing to read out of the Proposal prescription based on "applicable laws".  The fact that the Proposal used the Spanish word that can most closely be translated to "prescription" was not intended to exclude the application of the statute of limitations because in Spanish the concepts are not distinguishable.[10]

The discussions concerning the agreement on which Plaintiffs rely (Pls.' Mem. at 17) cannot change these clear terms.  And even the fact that the Republic stated that it would "be okay with the rider" (*id*. at 18) submitted by one Plaintiff cannot establish that there was a meeting of the minds to pay claims that the Republic believed to be barred by the statute of limitations because the parties had not exchanged fully executed settlement documents.  *See*

---

[10] Plaintiffs' emphasis on the use of the word "prescribed" in the Proposal is misleading. The operative proposal, written in Spanish, uses the term "prescriptos" to refer to claims that are time-barred.  This is because the Republic has a civil legal system, and in civil legal systems, statutes of limitation are called "periods of prescription".  *See* Cód. Civ. 3947-4043 (laws governing "prescripción de las cosas y de las acciones en general" and "prescripción de las acciones en particular"); *see also* La. Stat. Ann. §§ 9:5601-9:5701 (listing periods of prescription for various types of actions under Louisiana law); P.R. Laws Ann. tit. 31 § 5291 ("Actions are prescribed by the mere lapse of time specified by law").  All of this is consistent with the Republic's position that the Proposal does not apply to time-barred claims.

*Berman*, 580 F. Supp. 2d at 203 ("If, however, either party communicates an intent not to be bound until an agreement is fully executed, no amount of negotiation or oral agreement to specific terms will result in the formation of a binding contract.") (internal quotation marks and citation omitted).  Finally, contrary to Plaintiffs' suggestion, the fact that the Republic honored settlement agreements it executed—even mistakenly executed agreements that, in retrospect, the Republic determined included time-barred claims—cannot possibly support the suggestion that the Republic is trying to "renege" on or "rewrite" its settlements.  (Pls.' Mem. at 18.)  Rather, it demonstrates the Republic's good faith in adhering to binding agreements it has entered, even if it would prefer to do otherwise.

> **D.     Judicial Estoppel Does Not Apply Because the Republic Has Not Taken Inconsistent Positions.**

Plaintiffs argue that the Republic must pay them their requested settlement amounts, regardless of contract validity, on the basis of judicial estoppel.  (Pls.' Mem. at 19-20.) Judicial estoppel prevents a party from taking "clearly inconsistent positions" that would result in "unfair advantage" or the imposition of "unfair detriment" if the party is not estopped.  (*Id*. at 19.)  Plaintiffs' judicial estoppel argument is based on the Republic's prior representations regarding VR Global Partners, Procella Holdings and Red Pines LLC, none of which is seeking an injunction.  These statements do not relate to the issues in this Motion and do not support the application of judicial estoppel against the Republic in this case.  The doctrine does not apply for several additional reasons.

*First*, nothing in the Republic's position is contrary to its prior representations to this Court.  The Republic has indicated that any bondholder is free to seek a settlement under the Proposal (*id*. at 20), and that is not undermined by its position here.  The Republic never made any representation to the Court that even remotely suggests that the detailed requirements

contained in the Proposal, Instructions, Master Settlement Agreement and Agreement Schedule could be ignored.

*Second*, Plaintiffs claim that the Republic persuaded this Court to vacate the Injunctions by "touting its supposed settlement momentum", including its settlements with VR, Procella and Red Pines, which included time-barred claims in their Agreement Schedules. (*Id.*) VR and Procella, in fact, reached agreements with the Republic despite the inclusion of time-barred claims, so their listing was actual "evidence of numerous Agreements in Principle", not inconsistent with it. (*Id.* (internal quotation marks omitted).) And the execution of settlement agreements with VR and Procella that, in retrospect, included time-barred claims cannot possibly estop the Republic from declining to reach settlement agreements with other bondholders who assert claims that the Republic believes are time-barred.

Although the Red Pines Agreement Schedule was not executed and was therefore erroneously included among a list of settling bondholders submitted to this Court,[11] the Court issued its Indicative Ruling indicating that it would grant vacatur based on settlements other than Red Pines. Moreover, at the time of the Court's March 2 Order, the "vast majority of claims . . . amount[ing] to at least $6.2 billion" had been settled (March 2 Order at 4), and removing the mistakenly included Red Pines agreement would only reduce that amount by approximately 2%.[12]

---

[11] The Republic identified this error in its brief to the Second Circuit, where the March 2 Order is on appeal. (Def.-Appellee's Br. at 13 n.3, Mar. 21, 2016, ECF. No. 419.)

[12] Furthermore, as Plaintiffs' cases clarify, judicial estoppel does not apply to a party that has made an inadvertent mistake. According to *Intellivision v. Microsoft Corp.*, "courts have uniformly recognized that the purpose of the doctrine is to protect the integrity of the judicial process by prohibiting parties from deliberately changing positions according to the exigencies of the moment". 484 F. App'x 616, 619 (2d Cir. 2012) (internal quotation marks and alteration omitted). The Supreme Court in *New Hampshire v. Maine* specifically noted that "it may be appropriate to resist application of judicial estoppel when a party's prior position was based on

As a matter of fact, Red Pines and two other former plaintiffs in this action represented by the same counsel as the remaining Plaintiffs, the Honero and Spinnaker plaintiffs, have now also reached settlements with the Republic, which has caused them to withdraw their submissions to the Court of Appeals opposing the settlement.[13]  If those settling plaintiffs actually believed that they *already* had binding settlement agreements, there would have been no reason to enter into new settlements last week.  Of course, there were no prior agreements, because the Countersignature Condition had not been satisfied.

*Third*, Plaintiffs argue that it would be "manifestly unfair to permit Argentina to argue to the Court that all bondholders could accept its offer by February 29, and have the protections of the Injunctions, only to then avoid its payment obligations".  (Pls.' Mem. at 20 (emphasis omitted).)  However, the Republic has not avoided any payment obligations to Plaintiffs because it has not reached agreements with them, and it consequently has no payment obligations to them.

Because Plaintiffs have no agreements with the Republic, they are not entitled to the injunctive relief they seek.

## II.   PLAINTIFFS HAVE NOT MADE A SUFFICIENT SHOWING OF IRREPARABLE HARM.

Plaintiffs' claims are for breach of contract, and they argue that although any harm will be capable of being rectified by a money judgment, no adequate monetary remedy is available because, they contend, the Republic will not satisfy any such money judgment or

---

inadvertence or mistake". 532 U.S. 742, 753 (2001) (internal quotation marks and citation omitted); *see also EEOC v. CRST Van Expedited, Inc.*, 679 F.3d 657, 680 (8th Cir. 2012) (judicial estoppel not proper when "prior inconsistent position was attributable to a good faith mistake rather than as part of a scheme to mislead the court") (internal quotation marks and citation omitted).

[13] Since the filing of the original complaint in this case, the Republic has reached settlement agreements with Red Pines LLC, Honero Fund I, LLC, Spinnaker Global Special Situations Fund LP, and Spinnaker Global Emerging Markets Fund, Ltd.  (Hernández Decl. Ex. 5.)

settlement agreement.  However, Plaintiffs' evidence that the Republic will not satisfy any judgment is outdated and does not reflect the Republic's current attitude and actions with respect to resolving its disputes with bondholders, which this Court has twice found to be sufficient to discharge the Injunctions issued in related actions.  (*See* March 2 Order at 4-5; Indicative Ruling at 13-18, No. 14 Civ. 8601, Feb. 19, 2016, ECF No. 59 (hereinafter "Indicative Ruling").)

Plaintiffs support their argument that they will suffer irreparable harm because the Republic will "never honor" any confirmed Settlement Agreements or any monetary judgments by referring to decisions from the Second Circuit in 2012 and 2013 that were critical of the Republic's actions.  (Pls.' Mem. at 21.)  They also criticize the Republic's attempts to settle this litigation as "coercive" and as part of its "[s]elf-serving claims . . . . that it has changed its ways [which] offer no legally cognizable or other comfort to Movants".  (*Id*. at 22.)

However, Plaintiffs' "evidence" is either stale or rests upon misrepresentations of the Republic's efforts to resolve the litigation.  And Plaintiffs' arguments concerning the facts regarding recent changes in the Republic's approach to these litigations and its defaulted debt in general ignores that this Court has made factual findings regarding those issues in the Indicative Ruling and March 2 Order.  Plaintiffs are in no position to dispute those findings, and the Court should reject their attempt to relitigate the question of whether circumstances have changed.

On the substance, Plaintiffs' allegations with respect to the Republic's actions describe the Republic's conduct at a time when it was steadfastly refusing to pay bondholder plaintiffs anything.  However, the Republic has now promised to take (and has taken) concrete steps to resolve this litigation and those steps have been recognized by this Court.  Plaintiffs have totally ignored the "dramatic shift in . . . policy" that the Republic has undergone since the election of President Macri "that justifie[d] vacating the Injunctions".  (Indicative Ruling at 16.)

They further attempt to misrepresent the Republic's "good faith efforts to resolve the disputes" and "the Republic's earnest efforts to negotiate and its striking change in attitude toward settlement" since President Macri assumed office that this Court recognized have resulted in signed agreements in principle worth over $6.5 billion, which formed a key part of this Court's February 19 and March 2, 2016 orders vacating the Injunctions.  (*See* Indicative Ruling at 8, 9, 16; March 2 Order at 5.)  Plaintiffs further disregard the fact that the Republic has repealed the Lock Law legislation that this Court and the Second Circuit found in its 2012 and 2013 orders to be a factor in determining that the bondholders had "no adequate remedy at law".  *See NML Capital, Ltd. v. Republic of Argentina*, 727 F.3d 230, 241 (2d Cir. 2013) (hereinafter "*NML II*"); *NML Capital, Ltd. v. Republic of Argentina*, 699 F.3d 246, 260-62 (2d Cir. 2012) (hereinafter "*NML I*").  Not only has the Lock Law been repealed but the government also has been given authority to settle additional claims, such as those brought by Plaintiffs.  (*See* Hernández Decl. Ex. 1.)  Therefore, Plaintiffs cannot show that they will suffer irreparable harm, as it is clear that the Republic is both willing and able to resolve its disputes with bondholders.

As Plaintiffs are aware, the Republic is continuing to negotiate and enter into settlement agreements with other bondholders now, including former plaintiffs in this case, and it is willing to continue to do so.  The Republic is not acting in "bad faith" by asserting what it believes to be a valid legal defense to certain of Plaintiffs' claims, and Plaintiffs cite nothing to indicate that the Republic will fail to negotiate in the future or that it will not honor properly agreed-to settlements.  If Plaintiffs submit Agreement Schedules that only seek payment for claims the parties agree are consistent with the terms of the Proposal and that comply with the other requirements, as confirmed by the reconciliation process described in the Instructions, the Republic would countersign those Agreement Schedules and pay those settlements.

Taken together, the Republic's conduct is compelling evidence that it intends to respect the Court's decisions and to resolve this litigation by settling claims and honoring those settlement agreements, including any agreements that it may enter with Plaintiffs.[14] Accordingly, Plaintiffs cannot and have not made a sufficient showing that they will suffer irreparable harm if the temporary restraining order is not granted.

## III. THE BALANCE OF THE EQUITIES AND THE PUBLIC INTEREST WEIGH AGAINST PLAINTIFFS' REQUESTED RELIEF.

### A. The Equities Strongly Favor the Republic.

As noted above, interim injunctive relief may be ordered in a contract action against a foreign sovereign "where no adequate monetary remedy is available and that relief is favored by the balance of equities, which may include the public interest". *NML I*, 699 F.3d at 261. Where, as here, Plaintiffs are unable to show that they are likely to succeed on the merits, the "balance of hardships [must] tip[] decidedly toward" them in order for the relief to be

---

[14] *Itek Corp. v. First Nat'l Bank*, 730 F.2d 19, 22-23 (1st Cir. 1984), is factually distinct and does not support Plaintiffs' position. The futility of enforcing a money judgment in an Iranian court in the years following the Iranian hostage crisis, when there was a near-total breakdown of U.S.-Iran diplomatic relations, is a far cry from the present circumstance, where the Macri administration is fully cooperating with the U.S. government and has demonstrated its intent to resolving its debt obligations. On March 23, during a two-day visit to Argentina, President Obama said, "I'm impressed because [President Macri] has moved rapidly on so many of the reforms that he promised, to create more sustainable and inclusive economic growth, to reconnect Argentina with the global economy and the world community". He also said, "Argentina is re-assuming its traditional leadership role in the region and around the world." (Hernández Decl. Ex. 2.) The U.S. Treasury Secretary also praised "Argentina's good faith efforts to resolve this long-standing dispute". (Hernández Decl. Ex. 3.) On March 16, U.S. Treasury Undersecretary for International Affairs Nathan Sheets issued a statement saying, "We welcome the agreements in principle between Argentina and the holders of the large majority of claims on Argentina, and we support the ongoing efforts to secure legislative approval to allow settlements. Final implementation of these agreements should help Argentina return to international capital markets and would represent a constructive development for the entire global financial system." (Hernández Decl. Ex. 4.) In addition, the United States submitted an *amicus curiae* brief to the Court of Appeals supporting vacatur of the Injunctions. (*See* Brief for the United States as *Amicus Curiae*, Mar. 23, 2016, ECF No. 459.)

granted, and even then only if they are able to show that there are "sufficiently serious questions going to the merits to make them a fair ground for litigation." *ACLU v. Clapper*, 785 F.3d 787, 825 (2d Cir. 2015) (internal quotation marks omitted).

      In this matter, the balance of hardships tips decidedly in favor of the Republic, not Plaintiffs, because granting Plaintiffs the relief that they request would threaten the extensive progress that the Republic has made to resolve its defaulted debt obligations. As the Court is aware, for the past several months the Republic has engaged in detailed and lengthy negotiations with numerous bondholders to settle outstanding claims and has followed up on the successful conclusion of those negotiations with litigation to lift the *pari passu* Injunctions so that those settlement agreements, which are with holders of over 90% of the holdout bonds, can be consummated. Granting Plaintiffs' motion would force the Republic either to pay Plaintiffs sums that they had not agreed to pay or jeopardize the agreements in principle reached with the vast majority of bondholders, thereby threatening the Republic and the other bondholders' hard work toward reaching settlement. Avoiding such an unjust scenario weighs heavily in the Republic's favor.

      **B.**    **The Public Interest Strongly Weighs Against an Injunction.**

      The public interest does not favor forcing the Republic to comply with Plaintiffs' demands. Plaintiffs argue that "the public interest is served by requiring parties that enter binding contracts under New York law, such as the MSA, to honor [their] terms". (Pls.' Mem. at 23-24 (internal quotation marks and citation omitted).) However, there are no binding contracts to honor in this case.

      Plaintiffs also cite the "public interest in promoting the settlement of lawsuits", particularly in complex matters. (*Id.* at 24.) The Republic agrees that there is a strong judicial policy favoring settlement. However, settlement is not promoted by simply accepting one

party's preferred terms.  In any event, allowing the Injunctions to be vacated in timely fashion also encourages settlement.  As this Court has noted, "vacating the injunctions serves the public interest by encouraging settlement to resolve disputes generally", and "might even encourage other indebted nations to choose compromise over intransigence" in the future.  (Indicative Ruling at 20.)

Furthermore, allowing the Injunctions to be vacated expeditiously will benefit numerous third parties including "the exchange bondholders . . . the financial intermediaries that the Republic engages to help it pay the exchange bondholders; the FAA bondholders who favor settlement but are not parties to every single case; and the Argentine people generally".  (*Id.* at 18.)  This Court has stated that it is now "in the public interest for the Republic to resume paying its restructured debt", which the Republic can and will do once the Injunctions are lifted.  (*Id.* at 19.)  In addition, "[a]llowing the Republic to reenter the capital markets will undoubtedly help stimulate its economy and thus benefit its people".  (*Id.* at 20.)  Plaintiffs' requested injunction will further delay relief for all of these parties despite "a pressing need for certainty and finality".  (March 2 Order at 3.)

## IV.    CONCLUSION

For the foregoing reasons, Plaintiffs' motion should be denied.

April 10, 2016

Respectfully submitted,


CRAVATH, SWAINE & MOORE LLP,

by
                      /s/ Michael A. Paskin
                      Daniel Slifkin
                      Michael A. Paskin
                      Damaris Hernández
                      Members of the Firm

     Worldwide Plaza
        825 Eighth Avenue
          New York, NY 10019
            (212) 474-1000
               dslifkin@cravath.com

*Attorneys for Defendant The Republic of Argentina*