UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------ x

ARAG-A LIMITED, *et al.*,

                   Plaintiffs,

           v.

THE REPUBLIC OF ARGENTINA,

                   Defendant.

------------------------------------------------ x

16-cv-2238 (TPG)

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 4/12/16

## OPINION

Plaintiffs are a group of holders of defaulted Argentine bonds.[1] They claim to have entered into binding settlement agreements with the Republic of Argentina on or before February 29, 2016. Plaintiffs believe the Republic must honor these alleged agreements before the court vacates the *pari passu* injunctions.

The Republic now moves to dismiss for failure to state a claim, while plaintiffs move for a temporary restraining order and a preliminary injunction. For the following reasons, the court grants the Republic's motion to dismiss and denies plaintiffs' motions for injunctive relief.

---

[1] Plaintiffs are ARAG-A Limited, ARAG-O Limited, ARAG-T Limited, and ARAG-V Limited (together, "ARAG"); Attestor Value Master Fund LP ("Attestor"); Bybrook Capital Master Fund LP and Bybrook Capital Hazelton Master Fund LP (together, "Bybrook"); MCHA Holdings, LLC ("MCHA"); Trinity Investments Limited ("Trinity"); White Hawthorne, LLC and White Hawthorne II, LLC (together, "White Hawthorne"); and Yellow Crane Holdings, L.L.C. ("Yellow Crane").

Background

**1. The Settlement Documents**

After years of refusing to settle with holders of its defaulted bonds, the Republic returned to the negotiation table in January 2016.  On February 5, 2016, the Republic published a global settlement proposal, known as the "Propuesta."  The Propuesta outlined the settlement options open to holders of defaulted Argentine bonds.  Although the Propuesta contained proposed terms of settlement, it did not precisely describe the settlement procedure.

On February 17, the Republic clarified the settlement procedure by publishing on its website "the procedures by which eligible holders . . . may accept the terms" of the Propuesta.  The Republic issued a set of three settlement documents: (1) the "Instructions for Bondholders to Accept its Settlement Proposal"; (2) a "Master Settlement Agreement"; and (3) an "Agreement Schedule."  These three documents, read together, detailed how holders could reach settlement agreements with the Republic.

The Instructions advised holders "wishing to accept the Republic's proposal" to "proceed in accordance with the following [I]nstructions":

> Holders may become a party to a Settlement Agreement by executing and exchanging with the Republic a completed Agreement Schedule . . . .
> The holder must provide the Republic with (i) the information about its bonds called for by the attachment to the form of Agreement Schedule contained in the Master Settlement Agreement and (ii) the holder's calculation of the Settlement Amount for its bonds . . . .
> The holder must complete, sign and send the Agreement Schedule to the Republic including the information set forth . . . above.  That Agreement Schedule, when countersigned by the Republic, shall constitute a binding agreement between the parties to settle all claims in

respect of the bonds on the terms contained in the Master
Settlement Agreement.

The Instructions also contained information about how to calculate the
"Settlement Amount" for holders with *pari passu* injunctions.  Those holders
could elect a payment equal to the value of their judgment or claim, less a
discount.  The Instructions then outlined an "early-bird" incentive: "Holders that
execute and deliver . . . an Agreement Schedule prior to 5:00 pm New York time
on February 19, 2016 will have the Settlement Amount . . . calculated using a
discount of 27.5%," while holders that "execute and deliver" after that time "will
have the Settlement Amount . . . calculated using a discount of 30%."

Next, the Master Settlement Agreement outlined the general terms that
would apply to all settlement agreements executed through this procedure.  It
stated that an agreement "is made . . . between the Republic of Argentina . . .
and the Holder identified in . . . the Agreement Schedule signed by the parties in
connection with this Agreement," and that the "Agreement Schedule, when
executed and exchanged by the Republic and the Holder," would be "an integral
part of this Settlement Agreement."  The document then clarified that the
Agreement Schedule, to be effective, must be "completed . . . [,] signed (and
exchanged) by the Holder and the Republic," and that New York law would
govern.

Finally, the Agreement Schedule provided a template that holders and the
Republic would fill out to resolve and record each holder's specific settlement
information.  As part of each Agreement Schedule, the parties were to agree on

3

and enter a "Settlement Amount"—a figure to be "reconciled between the Republic and the Holder."  The Agreement Schedule then concluded as follows:

> By executing counterparts of this Agreement Schedule in the space provided below and exchanging those counterparts, the parties agree to be bound by the terms of the Settlement Agreement, as completed by the information contained in this Agreement Schedule.
>
> [Name of Holder]                    Republic of Argentina
>
> /s/ _____                           /s/ _____
>
> By: ___                             By: Luis A. Caputo
>
> Title: _                            Title: Secretary of Finance
>
>    DATE:

## 2. The Settlement Agreements

After the Republic published the Propuesta, it began to reach agreements to settle with holders, both large and small.  Some holders used the procedure published on the Republic's website to execute and exchange with the Republic completed and countersigned Agreement Schedules.[2]  Others sought to add new terms to the Agreement Schedule or draft counterproposals from scratch.

At least two nonparty holders—Procella Holdings L.P. and VR Global Partners, L.P.—reached settlement agreements with the Republic despite adding a "rider" to their Agreement Schedules.  The rider confirmed that "the Republic will not assert that the Holder's claims to any Bonds listed thereon are untimely,

---

[2] *See, e.g.*, Am. Compl. Exs. 3–6 (Capital Markets Financial Services, Old Castle Holdings, Lightwater Corporation, and Capital Ventures International).

or otherwise time-barred." Am. Compl. Exs. 7–8. The Republic's representatives reviewed these modified Agreement Schedules and then countersigned them.

Another nonparty holder—Honero—tried to add a rider to its Agreement Schedule. After Honero submitted a spreadsheet of its bond holdings on February 16, the Republic responded the next day with a link to the Master Settlement Agreement and wrote that it "did not find any issues" with Honero's list of bonds. Am. Compl. ¶ 112. On February 18, Honero returned the settlement documents to the Republic but added a rider similar to Procella's and VR's. The Republic emailed Honero on February 19 to say that it would "be okay with the rider," but a few days later informed Honero that, after reviewing the calculations, the Republic believed Honero was "not taking into consideration the statu[te] of limitations." Am. Compl. ¶ 114. Honero then rescinded its prior submissions and emailed a second signed Agreement Schedule that did not contain the rider. The Republic did not countersign either of Honero's Agreement Schedules. *See* Am. Compl. ¶¶ 112–15. Like Honero, plaintiffs in this action emailed Agreement Schedules, signed by them, to the Republic by February 29. Although the Republic allegedly "acknowledged receipt" of these Agreement Schedules, it did not exchange countersigned versions with any plaintiff in this action. *See* Am. Compl. ¶¶ 79–100.[3]

---

[3] For Bybrook, Argentina responded to the Agreement Schedule by stating that Bybrook was "not taking into account the Statu[te] of Limitation for your claim." Am. Compl. ¶ 98. For MCHA, the Republic initially responded that it had "received [MCHA's] documentation succes[s]fully," and that it would "consider this last Settlement Agreement." Am. Compl. ¶ 100. Argentina then emailed MCHA again, stating that MCHA was "not taking into account Statu[te] of Limitation on [its] figures." *Id.* For Yellow Crane, there is no allegation that the Republic even "acknowledged receipt" of the Agreement Schedule.

**3. The Indicative Ruling**

After the Republic reached settlement agreements with several large holders not in this case, it moved to vacate the *pari passu* injunctions that this court had previously entered in sixty-two related actions.  Because some of those actions were on appeal at the time, the Republic also sought an Indicative Ruling under Federal Rule of Civil Procedure 62.1 to allow the court to decide whether it *would* vacate the injunctions were the Second Circuit to remand for that purpose.

On February 19, the court issued its Indicative Ruling and explained that it would conditionally vacate the injunctions upon remand.  The first condition was that the Republic must repeal legislative obstacles to settlement, and the second was that, "[f]or all plaintiffs that enter into agreements in principle with the Republic on or before February 29, 2016, the Republic must make full payment in accordance with the specific terms of each such agreement." Indicative Ruling 23, *NML Capital, Ltd. v. Republic of Argentina*, No. 14-cv-8601 (S.D.N.Y. Feb. 19, 2016).[4]  As the court explained, "at the Republic's own urging, the injunctions would remain in effect until it actually makes full payment on all agreements in principle entered into by February 29, 2016." *Id.* at 17.  The court also decreed that all holders had "the right to accept the terms" of the Propuesta until at least February 29 and that, "[i]f they reach agreements by that date, they

---

[4] On March 31, 2016, the Republic satisfied the first condition by repealing the legislative obstacles to settlement, including the Lock Law and the Sovereign Payment Law.

will receive the protections incorporated by this ruling—namely, the Republic must pay their settlements in full before the injunctions are lifted." *Id.* at 22.

### 4. The Vacatur Order

After the Republic voluntarily dismissed two pending appeals, the Second Circuit remanded all of the *pari passu* injunction cases to allow this court to formally enter the Indicative Ruling as an order. The court then invited interested parties to submit further briefing on the issue of vacatur.

On February 29, the Republic submitted a supplemental memorandum in support of vacatur in which it discussed settlements it had reached with injunction holders "totaling in excess of $6.2 billion . . . plus additional amounts with other holders of defaulted debt." Suppl. Mem. L. 3, *NML Capital, Ltd. v. Republic of Argentina*, No. 08-cv-6978, Dkt. 904 (S.D.N.Y. Feb. 29, 2016). The "Bausili Declaration" accompanied this memorandum, and attached as exhibits several documents labeled as "Agreement[s] in Principle" that had been "executed" to date. Bausili Decl. ¶¶ 7–13, *NML Capital, Ltd. v. Republic of Argentina*, No. 08-cv-6978, Dkt. 904 (S.D.N.Y. Feb. 29, 2016). Among those exhibits were the countersigned and modified Procella Agreement Schedule, discussed above, and a non-countersigned Agreement Schedule with Red Pines LLC. *See id.* ¶¶ 12–13. The Bausili Declaration also asserted generally that "the Republic has entered into agreements in principle to settle claims made by numerous bondholders." *Id.* ¶ 6.[5]

---

[5] On the same day, some of the plaintiffs in this action (ARAG, MCHA, Trinity, and Yellow Crane) submitted a letter to the court asserting that they had "now reached settlement with the Republic . . . having accepted the offer Argentina made via its Master Settlement Agreement," and that

On March 2, the court formally adopted the Indicative Ruling and conditionally vacated the *pari passu* injunctions.  The court's order highlighted that the Republic had reached further agreements in the injunction actions, and found that that "[t]he total settlement consideration now amounts to at least $6.2 billion, potentially resolving over 85% of the claims held by plaintiffs with injunctions."  Op. & Order 4, *NML Capital, Ltd. v. Republic of Argentina*, No. 08-cv-6978 (S.D.N.Y. Mar. 2, 2016).  The court then reiterated the second condition to vacatur: "For all plaintiffs that entered into agreements in principle with the Republic on or before February 29, 2016, the Republic must make full payment in accordance with the specific terms of each such agreement."  *Id.* at 5.

## 5. The Instant Action

Over the course of the following week, plaintiffs in this action sought to ascertain whether their non-countersigned Agreement Schedules were sufficient to form binding agreements.  On March 11, the Republic formally advised plaintiffs that it did not believe the parties had formed binding agreements because the Republic had not countersigned.[6]

---

"[t]wo of these settlements were published today by the Republic in its supplemental filings." Willett Letter, *NML Capital, Ltd. v. Republic of Argentina*, No. 08-cv-6978, Dkt. 906 (S.D.N.Y. Feb. 29, 2016).  The letter also asserted that the remaining plaintiffs in the group had "accepted the Republic's settlement offer on identical terms to Red Pines LLC, on or prior to February 29, 2016."  *Id.*  Then, on March 2, two plaintiffs in this action (Red Pines and Trinity) requested by letter an adjournment of filing deadlines in two related actions.  The plaintiffs stated that "Argentina has assented to this relief."  *Red Pines LLC v. Republic of Argentina*, No. 14-cv-9427 (S.D.N.Y. Mar. 2, 2016).  The letter also contained the assertion that the plaintiffs "have accepted the Republic of Argentina's offer of settlement with respect to the bonds at issue in these matters."  *Id.*  The court granted the adjournment.

[6] *See* Email from S. Willett to M. Paskin, Mar. 11, 2016.  Subsequently, on March 14, some plaintiffs in this action filed an emergency motion to intervene in a Second Circuit appeal that challenged the vacatur order.  They claimed to have "accepted Argentina's settlement offer . . . by completing, executing and returning, without variance, the form of Master Settlement Agreement."  Br. 7, *Aurelius Capital Master, Ltd. v. Republic of Argentina*, No. 16-628 (2d Cir.

On March 25, plaintiffs filed a complaint in this action.  They seek a declaration that they each have a "valid and binding contract" with the Republic constituting an "agreement in principle" within the meaning of the second condition to vacatur, such that plaintiffs must receive payment before the *pari passu* injunctions are lifted.  Am. Compl. ¶ 9.  On April 6, the Republic moved to dismiss for failure to state a claim under Rule 12(b)(6).  The following day, plaintiffs filed an amended complaint and moved, by order to show cause, for a temporary restraining order and a preliminary injunction.  Given the urgency created by the related appeal before the Second Circuit, which is to be heard on April 13, the parties also agreed on a schedule for all motions in this action that concluded all briefing on April 11.

Discussion

### 1. The Republic's Motion to Dismiss

On a motion to dismiss for failure to state a claim, this court must draw all reasonable inferences in plaintiffs' favor, assume well-pleaded factual allegations to be true, and determine whether they plausibly give rise to an

---

Mar. 14, 2016).  Each plaintiff therefore claimed to have "formed binding contracts with Argentina subject only to reconciling the 'Settlement Amount,' *i.e.*, Argentina verifying that the accepting party indeed holds the stated bonds and that the mathematical terms set out in the instructions conform to the 'Settlement Amount.'"  *Id.* at 17.  The Republic's brief in opposition to the principal appeal clarified its position as to plaintiffs' purported "agreements": the Republic would not countersign them "because they include claims that the Republic believes are time-barred."  *See* Br. 48 n.17, *Aurelius Capital Master, Ltd. v. Republic of Argentina*, No. 16-628 (2d Cir. Mar. 21, 2016).  Finally, the Republic conceded that it had made two mistakes.  First, the Republic's counsel had "mistakenly included in the list of settlements provided to the district court that it had reached an agreement in principle with Red Pines LLC," when in fact the Republic had not because it never countersigned the Agreement Schedule.  *Id.* at 13 n.3.  Second, after the Republic countersigned the Procella and VR Agreement Schedules, it realized that the agreements would provide for payment on time-barred claims.  "The Republic asked those parties, in the interest of fairness, to amend the agreements to remove payments related to time-barred claims, but they refused."  *Id.*

entitlement to relief.  *Faber v. Metro. Life Ins.*, 648 F.3d 98, 104 (2d Cir. 2011).
The court is "not, however, bound to accept conclusory allegations or legal
conclusions masquerading as factual conclusions." *Id.* at 104.  A complaint is
"deemed to include"—and the court may therefore consider—"materials
incorporated in it by reference, and documents that, although not incorporated
by reference, are integral to the Complaint." *Sira v. Morton*, 380 F.3d 57, 67 (2d
Cir. 2004).

To state a claim for breach of contract under New York law, plaintiff must
first allege "the existence of an agreement." *Harsco Corp. v. Segui*, 91 F.3d 337,
348 (2d Cir. 1996).  "To establish the existence of an enforceable agreement, a
plaintiff must establish an offer, acceptance of the offer, consideration, mutual
assent, and an intent to be bound," and "[t]hat meeting of the minds must
include agreement on all essential terms." *Kowalchuk v. Stroup*, 61 A.D.3d 118,
121 (1st Dep't 2009) (citing 22 N.Y. Jur. 2d Contracts §§ 9, 31).  Courts must
look to "the plain meaning of the language employed" to ascertain the parties'
intent, and "[w]ords and phrases are given their plain meaning." *PaineWebber
v. Bybyk*, 81 F.3d 1193, 1199 (2d Cir. 1996).  Where the parties' intent "can be
determined from the face of the agreement, interpretation is a matter of law, and
a claim turning on that interpretation may thus be determined . . . by dismissal."
*Id.* (citations omitted).  Moreover, "if the parties to an agreement do not intend it
to be binding upon them until it is reduced to writing and signed by both of
them, they are not bound and may not be held liable until it has been written
out and signed." *Scheck v. Francis*, 26 N.Y.2d 466, 469–70 (1970).  Accordingly,

a claim for breach of contract that "fails to allege facts sufficient to show that an enforceable contract existed between the parties is subject to dismissal." *Fuji Photo Film U.S.A. v. McNulty*, 669 F. Supp. 2d 405, 412 (S.D.N.Y. 2009).

  a. *The documents' plain terms require countersignature*

As even plaintiffs admit, the Republic's settlement documents are "clearly and precisely written,"[7] though the correct construction does not furnish the result that plaintiffs desire.  Rather, the documents explicitly provide that plaintiffs must have "exchanged" a "countersigned" Agreement Schedule in order to form a "binding agreement" with the Republic.  None of plaintiffs' Agreement Schedules, however, were exchanged and countersigned.  It follows that the amended complaint fails to state a valid claim to obtain a declaration that plaintiffs have binding settlement agreements with the Republic.  *See generally Longo v. Shore & Reich, Ltd.*, 25 F.3d 94, 97 (2d Cir. 1994) (finding that there can be "no binding agreement" without a countersignature when the parties "evidenced an intent . . . not to be bound to the terms of their negotiations until the agreement was . . . countersigned"); *Scheck*, 26 N.Y.2d at 97 (holding that a cover letter that "required both parties to sign . . . evidence[d] the intention of the parties not to be bound until the agreements were signed").

The Republic apprised all holders that "wish[ed] to accept" the Propuesta's terms to "proceed in accordance with the . . . [I]nstructions."  The Instructions then provided that a holder "may become a party to a Settlement Agreement by

---

[7] *See* Br. 20, *Aurelius Capital Master, Ltd. v. Republic of Argentina*, No. 16-628 (2d Cir. Mar. 14, 2016).

executing and exchanging with the Republic a completed Agreement Schedule," and that the holder "must complete, sign and send the Agreement Schedule to the Republic." As the final step, the Instructions confirmed that the "Agreement Schedule, when countersigned by the Republic, shall constitute a binding agreement between the parties." In short, by the document's plain terms, holders needed to execute and exchange countersigned Agreement Schedules with the Republic in order to form binding settlement agreements.

This construction finds support in the text of the Master Settlement Agreement, which provided that the Agreement Schedule, "when executed and exchanged by the Republic and the Holder," would be "an integral part" of the settlement agreement. For good measure, the Master Settlement Agreement defined "Agreement Schedule" as "the completed Agreement Schedule signed (and exchanged) by the Holder and the Republic." The Agreement Schedule itself reiterated the requirements of execution, exchange, and countersignature. The preamble provided that, "[b]y executing counterparts of this Agreement Schedule in the space provided below and exchanging those counterparts, the parties agree to be bound by the terms of the Settlement Agreement." And, as shown in the image above, the blank signature lines—both marked with "/s/"—left the "space" to affix signatures of *both* parties.

The fact that both signature lines contained "/s/" belies plaintiffs' claim that the "/s/" on the Republic's side served as "a pre-signed acceptance" that allowed plaintiffs to form a binding agreement without the Republic's manual countersignature. *See* Am. Compl. ¶ 63. If that were true, there would be no

need for even the *holder* to manually sign the Agreement Schedule—and the Instructions made abundantly clear that each holder must sign.  *See, e.g.*, Instructions ("The holder must . . . sign . . . the Agreement Schedule.").  Moreover, if the "/s/" on the Republic's side constituted a countersignature, it would render meaningless the Instructions' reference to a future time "when" each Agreement Schedule would be "countersigned by the Republic."[8]   The only plausible interpretation is that "/s/" denoted the space where *both* parties must sign by hand.[9]

Plaintiffs seek to avoid this interpretation by referring to the Republic's settlement documents as an "offer" and claiming that they all submitted signed Agreement Schedules as "acceptances" of that offer.  But these labels are no more than legal conclusions masquerading as factual assertions, and the court need not accept them as true on a motion to dismiss.  *Kirch v. Liberty Media Corp.*, 449 F.3d 388, 398 (2d Cir. 2006).  Similarly, there is no plausible basis for plaintiffs' suggestion that the Republic's "acknowledgement of receipt" of the various Agreement Schedules could serve as a substitute for countersignature.

---

[8] *Cf.* 22 N.Y. Jur. 2d Contracts § 249 ("Since no provision of a contract should be left without force and effect, that interpretation of a contract is favored which will make every part of it effective or which gives meaning to every provision.").

[9] Practically speaking, it makes perfect sense to require a countersignature under the circumstances.  If a one-sided "acceptance" by a purported "holder" sufficed to bind the Republic, then anyone could form a binding agreement before the Republic had the chance to review and validate the supporting documentation.  Indeed, the Agreement Schedule explicitly incorporates that logic by requiring both parties to agree on a "Settlement Amount," which is a figure "reconciled between the Republic and the Holder."  Moreover, the Agreement Schedules could not have represented "pre-signed acceptances" because the form did not include significant, material terms of the alleged agreements, such as the amount each bondholder would be paid to settle.  *See Express Indus. & Terminal Corp. v. N.Y. State DOT*, 93 N.Y.2d 584, 590 (N.Y. 1999).

Nor may plaintiffs find solace in the paragraph within the Instructions concerning *calculation* of the Settlement Amount, which explained that holders who "execute and deliver . . . an Agreement Schedule" by a specified time "will have the Settlement Amount . . . calculated using a discount." Plaintiffs misleadingly quote only one part of this language to suggest that holders "will have" a settlement agreement for a specific amount even absent countersignature. But this clearly ignores the overall purpose of the paragraph and the latter part of the sentence, which show that the words "will have" entitle the holder to no more than a certain calculation formula. The words do not grant the holder the ability to unilaterally form a binding agreement. All told, the facts alleged in the amended complaint simply do not lead to the legal conclusions plaintiffs need if they are to state a valid claim.

The modified and countersigned Procella and VR Agreement Schedules do not suggest a contrary conclusion. Plaintiffs rely on those documents as proof that they too have binding agreements because, like Procella and VR, they sought to accept the Propuesta's terms even though their holdings included potentially time-barred claims. But this argument ignores two clear differences. First, the Procella and VR Agreement Schedules had riders that explicitly allowed time-barred claims, whereas plaintiffs' Agreement Schedules did not. Second, the Republic countersigned Procella's and VR's Agreement Schedules, whereas it did not countersign plaintiffs'. Perhaps more importantly, simply because the Republic signed a settlement agreement to pay *one* holder's arguably time-barred claims does not mean that the Republic had to do the same for *every* holder.

The parties have a right to negotiate whatever agreements they find appropriate to resolve each case.  There need not be complete uniformity across the board.

Similarly, the Republic's prefatory communications with Honero and certain plaintiffs in this action do not alter the settlement documents' plain and unambiguous meaning.  Although the Republic initially told Honero over email that it "did not find any issues" with the list of bonds, and that it would "be okay with the rider," these discussions did not lead to a countersigned Agreement Schedule.  *See Berman v. Sugo*, 580 F. Supp. 2d 191, 203 (S.D.N.Y. 2008) ("If . . . either party communicates an intent not to be bound until an agreement is fully executed, no amount of negotiation or oral agreement to specific terms will result in the formation of a binding contract.").  Indeed, Honero previously admitted that it rescinded those prior submissions, leaving only the non-countersigned Agreement Schedule it emailed the Republic on February 29.  Compl. ¶ 77.  In that sense, Honero was identically situated to plaintiffs in this action: none of them had the exchanged and countersigned Agreement Schedule needed to create a binding agreement with the Republic.

Plaintiffs also point to the Bausili Declaration as evidence that they have binding agreements.  In that sworn statement, the Republic stated that it had "executed" an "Agreement in Principle" with Red Pines—a nonparty to this action—even though the attached Agreement Schedule had no countersignature.  But simply calling something an "Agreement in Principle" does not actually make

it so.  The nomenclature used in the Bausili Declaration cannot trump the definite and precise language of the settlement documents.[10]

Finally, the cases plaintiffs cite actually support the decision this court has reached.  Each case stresses either that any acceptance must comply with an offer's terms, or that there can be no binding offer when the promisor conditions his promise on his own future approval.[11]  Here, the terms of the settlement documents explicitly and unambiguously required a countersignature—something that no plaintiff procured.

### b. *The settlement documents did not create an irrevocable offer*

Plaintiffs' principal rebuttal is that there was no countersignature requirement because the settlement documents constituted an irrevocable offer that plaintiffs were free to accept.  The countersignature provision, they say,

---

[10] It is important to note that the court's decision to vacate the *pari passu* injunctions was not influenced by the non-countersigned Red Pines Agreement Schedule, attached as an exhibit to the Bausili Declaration.  The court intentionally confined its discussion of the recent settlements to those reached by "plaintiffs with injunctions," and Red Pines had no injunction.  *See* Op. & Order 4, *NML Capital, Ltd. v. Republic of Argentina*, No. 08-cv-6978 (S.D.N.Y. Mar. 2, 2016).  Plaintiffs' judicial-estoppel argument thus fails.  *See New Hampshire v. Maine*, 532 U.S. 742, 750–51 (2001) (explaining that one factor in deciding whether to apply judicial estoppel is whether the party actually persuaded the court to accept its prior position).  In any event, judicial estoppel is a discretionary doctrine, *see id.* at 750, and the court declines to invoke it here.  The court also notes that the Red Pines Agreement Schedule indicated a Settlement Amount of around €129 million.  To suggest that the Red Pines "settlement" would have swayed the court's vacatur decision—when over $6.2 billion in other settlements had been reached at that time—is a stretch, to say the least.

[11] *See Krumme v. WestPoint Stevens Inc.*, 143 F.3d 71, 83 (2d Cir. 1998) ("Under New York law, an acceptance must comply with the terms of the offer."); *Zheng v. City of New York*, 19 N.Y.3d 556, 579 (2012) (noting that the plaintiff had "accepted [defendant's] offer in accordance with its terms"); *Wigod v. Wells Fargo Bank, N.A.*, 673 F.3d 547, 561 (7th Cir. 2012) (stating that "[c]ertainly, when the promisor conditions a promise on his own future action or approval, there is no binding offer," that "[a] condition of subsequent approval by the promisor in the promisor's sole discretion gives rise to no obligation," and that "[a] manifestation of willingness to enter into a bargain is not an offer if the person to whom it is addressed knows or has reason to know that the person making it does not intend to conclude a bargain until he has made a further manifestation of assent").

allowed the Republic only to "check the math," not to decide whether or not to form a contract.   Plaintiffs allege that their unilateral "acceptances" were sufficient to form binding contracts.  This argument fails for at least two reasons.

*First*, neither the Propuesta nor the settlement documents ever "promise[] to keep [an] offer open for a specified period of time."  *See* Pls.' Mem. Supp. Order Show Cause 11 (citing Glen Banks, 28 N.Y. Prac., Contract Law § 26:23).  The Propuesta has no expiration date—indeed, it remains open—and nothing in the documents conditioned settlement payment on agreement by a certain date.  The two dates to which plaintiffs point—February 19 and 29—do not assist them. February 19 was a date that triggered differing "discounts" as an "early-bird" incentive, while February 29 merely serves as the date by which holders must reach settlement agreements if they are to be paid as a precondition to vacating this court's *pari passu* injunctions.  February 29 was also significant because the Argentine Congress was to convene on March 1, and the Republic's administration needed to be able to tell the Congress the amount of potential settlements as of that date.   But February 29 was never a cut-off date for settlement.  Indeed, the Republic has repeatedly made clear that it intends to honor all settlement agreements it reaches, including those entered into after February 29, as evidenced by the Republic's continuing settlements with bondholders, including former plaintiffs in this action.

*Second*, even if the Propuesta or the settlement documents did constitute an "irrevocable offer," plaintiffs fail to show that they "accepted in accordance with [the] terms" of that "offer."  *See USA Network v. Jones Intercable, Inc.*, 729

F. Supp. 304, 309 (S.D.N.Y. 1990).  Under New York law, "for an acceptance to be effective," it must not only "comply with the terms of the offer" but also "be clear, unambiguous and unequivocal."  *King v. King*, 208 A.D.2d 1143, 1143–44 (3d Dep't 1994).  Some of the plaintiffs' submissions incorrectly sought to elect the calculation open to holders of *pari passu* injunctions even though the relevant bonds were not covered by those injunctions.[12]  The plain terms of the settlement documents rendered those bonds ineligible for that option, and the purported "acceptances" could not be valid.  More broadly, submissions by all plaintiffs in this action included claims for bonds that the Republic believed were time-barred.  The Republic excluded such claims under the terms of the Propuesta, which was incorporated into the settlement documents.  *See* Dkt. 30, Paskin Decl. Ex. 1 ("[T]he amounts of capital and/or interest of the bonds that have been prescribed according to . . . the applicable laws will not be acknowledged."); *see also* Dkt. 37, Scotch-Marmo Decl. Ex. 5 ("Neither offer will be available to time-barred claims.").[13]  Thus, even if plaintiffs were correct that the countersignature requirement permits the Republic only to "check the math,"

---

[12] *See, e.g.*, Df.'s Mem. Opp. Order Show Cause 4–5, 14–15 (collecting relevant exhibits that show plaintiffs' various submissions).

[13] The Propuesta, which is in Spanish, uses the term "prescriptos" to refer to claims that time-barred.  The Republic has a civil legal system, and these systems refer to statutes of limitation as "periods of prescription."  *See* Cód. Civ. 3947-4043 (laws governing "prescripción de las cosas y de las acciones en general" and "prescripción de las acciones en particular"); *see also* La. Stat. Ann. §§ 9:5601–9:5701 (listing periods of prescription for various types of actions under Louisiana law); P.R. Laws Ann. tit. 31 § 5291 ("Actions are prescribed by the mere lapse of time specified by law.").

the Republic could decline to form a binding agreement if it disagreed with a calculation that encompassed claims on bonds that it believed were untimely.[14]

   c. _Dismissal is with prejudice because amendment would be futile_

   If the court determined that the operative complaint fails to state a valid claim, plaintiffs request leave to further amend their complaint.  Under Rule 15(a)(2), courts "should freely give leave when justice so requires," but courts may deny leave "where amendment would be futile."  _Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Secs., LLC_, 797 F.3d 160, 190 (2d Cir. 2015).  Denial is particularly appropriate where plaintiffs' request "gives no clue as to 'how the complaint's defects would be cured.'"  _See id._ (quoting _Porat v. Lincoln Towers Cmty. Ass'n_, 464 F.3d 274, 276 (2d Cir. 2006).

   Plaintiffs seek to justify their request on two grounds.  First, they urge that the briefing occurred on a compressed schedule, leaving them no opportunity to meaningfully consider further amendment.  Second, plaintiffs wish to have the benefit of this opinion to craft a second amended complaint.

   While it is true that the parties briefed these motions on an expedited basis, there was good reason to do so.  Plaintiffs themselves have repeatedly stressed the urgent need to resolve the underlying dispute before the _pari passu_ injunctions can be vacated.  Indeed, it was plaintiffs that moved for injunctive

---

[14] The instant motions do not present the issue of whether the relevant statutes of limitations would in fact bar plaintiffs' claims.  Rather, assuming there was an irrevocable offer, the question would be whether the Propuesta and the settlement documents indicated that the Republic would recognize claims it believed were untimely as part of the settlement amounts it agreed to pay.  Any disagreement as to whether the claims are actually timely merely demonstrates, yet again, that there was no meeting of the minds concerning material terms—and, therefore, no binding agreement.  And, incidentally, it further illustrates why the Republic made a countersignature critical to formation of binding agreements.

relief—by order to show cause—and that urged the court to act quickly.  The resolution of both parties' motions involved overlapping issues, and addressing one set of motions without considering the other would have been senseless. Moreover, as this court has already explained in related cases, there is a pressing need for certainty and finality as to the question of whether the *pari passu* injunctions are to be vacated, and these cases present extraordinary circumstances that implicate the fate of a sovereign nation.  *See* Op. & Order 4, *NML Capital, Ltd. v. Republic of Argentina*, No. 08-cv-6978 (S.D.N.Y. Mar. 2, 2016); Order 1–2, *NML Capital, Ltd. v. Republic of Argentina*, No. 08-cv-6978 (S.D.N.Y. Mar. 15, 2016).  The Republic has already satisfied the first condition to vacatur, and plaintiffs to this action sought a speedy determination as to how their claims would affect the Republic's ability to satisfy the second condition. The parties' wishes, and the court's decision, to have these motions considered expeditiously was prudent.

Finally, where an unambiguous document requires dismissal in a contract case, further amendment will often be futile.  *See Berman*, 580 F. Supp. 2d at 203.  Here, the court has found that a countersignature was necessary to form a binding agreement.  Since no plaintiff has been able to bring forth an exchanged and countersigned Agreement Schedule—something that would necessarily have been in each plaintiff's possession—further leave to amend would provide no cure for the legal deficiencies of the two previous complaints. Nor could plaintiffs garner additional information from this opinion to help them adequately replead their claims.  To grant leave would invite plaintiffs to partake

in an exercise of futility.  *See Bender v. Gen. Servs. Admin.*, No. 05-cv-6459, 2006 WL 1643345, at 1* (S.D.N.Y. June 9, 2006) (dismissing request for leave to amend as "it appears beyond a doubt that the movant can prove no set of facts in support of its claim which would entitle it to relief"); *Berman*, 580 F. Supp. 2d at 203 (denying leave to amend when plaintiffs had not pled facts that could show "an enforceable contract as a matter of law").

### 2. Plaintiffs' Motions for Injunctive Relief

Due to the court's dismissal of the amended complaint, plaintiffs' motions for temporary and preliminary injunctive relief are moot, as is plaintiffs' request for expedited discovery.  As a result of this opinion, there is no longer an operative complaint upon which plaintiffs' could seek such extraordinary remedies.  In any event, for the reasons explored above, plaintiffs cannot demonstrate a likelihood of success or a sufficiently serious question on the merits, nor can the equities or public interest support injunctive relief.  *See Benihana, Inc. v. Benihana of Tokyo, LLC*, 784 F.3d 887, 895 (2d Cir. 2015).

<u>Conclusion</u>

Because plaintiffs in this action never exchanged countersigned Agreement Schedules with the Republic, the parties never formed binding agreements.  The court therefore dismisses with prejudice the amended complaint and denies as moot plaintiffs' motions for injunctive relief.

For purposes of the court's vacatur order, plaintiffs did not enter into "agreements in principle with the Republic on or before February 29, 2016."

Accordingly, the Republic need not pay these plaintiffs in order to fulfill the second condition to lifting the *pari passu* injunctions.

The Republic has now satisfied the first condition by repealing the legislative obstacles to settlement, including the Lock Law and the Sovereign Payment Law. It must now await a decision in the Court of Appeals, which will determine whether the Republic will be in a position to satisfy the second condition.

SO ORDERED

Dated: New York, New York
       April 12, 2016

Thomas P. Griesa
United States District Judge